**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 05-4805

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

BRIAN L. TRIBBLE,

Defendant - Appellant.

Appeal from the United States District Court for the Northern District of West Virginia, at Martinsburg. W. Craig Broadwater, District Judge. (CR-03-64)

Argued: September 21, 2006         Decided: December 15, 2006

Before WILKINS, Chief Judge, KING, Circuit Judge, and HAMILTON, Senior Circuit Judge.

Affirmed by unpublished per curiam opinion.

**ARGUED:** Barry Philip Beck, POWER, BECK & MATZUREFF, Martinsburg, West Virginia, for Appellant. Paul Thomas Camilletti, OFFICE OF THE UNITED STATES ATTORNEY, Martinsburg, West Virginia, for Appellee. **ON BRIEF:** Thomas E. Johnston, United States Attorney, Martinsburg, West Virginia, for Appellee.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Brian L. Tribble appeals from his convictions and sentence in the Northern District of West Virginia on multiple counts of mail fraud, wire fraud, and workers' compensation fraud.[1] Following his jury trial in March of 2003, Tribble was sentenced to twenty-four months of imprisonment, plus restitution of more than $92,000. He makes five contentions of error: first, that the prosecution constructively amended the indictment; second, that he was prejudiced by a variance between the indictment and the proof; third, that the court erred in admitting evidence of prior acts; fourth, that the evidence fails to support the verdict; and, finally, that the court erroneously concluded, in calculating his Guidelines sentencing range, that the loss caused by his criminal activity included payments received after he had been indicted. As explained below, we reject each of these contentions and affirm.

I.

A.

Tribble began working for the United States Postal Service (the "USPS") in 1987.[2] On June 20, 1996, while working as a mail

_____

[1]Tribble was convicted of twenty-six offenses: five counts of mail fraud, in violation of 18 U.S.C. § 1341; nineteen counts of wire fraud, in contravention of 18 U.S.C. § 1343; and two counts of workers' compensation fraud, in violation of 18 U.S.C. § 1920.

[2]The factual predicate for Tribble's convictions is drawn from the trial record, and is spelled out in the light most favorable to the prosecution. See United States v. Pasquantino, 336 F.3d 321,

handler at a USPS facility in Dulles, Virginia (the "Dulles facility"), Tribble suffered a work-related injury to his neck, right shoulder, and back when the door of a defective metal bulk mail container struck his head. Claiming that this injury rendered him unable to continue in his USPS job, he applied for compensation benefits under the Federal Employees' Compensation Act. On October 2, 1996, it was determined that Tribble's injuries were such that he could not perform any aspect of his job. Thereafter, on January 30, 1997, the Department of Labor (the "DOL") Office of Workers' Compensation Programs (the "OWCP") approved his claim and notified Tribble that he was entitled to compensation benefits.

As a recipient of federal workers' compensation benefits, Tribble was required to periodically file with the OWCP its Form EN1032, on which he was obliged to report any employment he had undertaken or income he had earned in the preceding fifteen months. Each Form EN1032 required that Tribble acknowledge his obligation to "immediately report to OWCP any improvement in [his] medical condition." J.A. 699.[3] Tribble would receive each Form EN1032 by mail from the OWCP, and he returned the completed Forms to the OWCP in the same manner. At no time during his receipt of compensation

332 (4th Cir. 2003) (en banc).

[3]Citations herein to "J.A. ___" refer to the contents of the Joint Appendix filed by the parties in this appeal.

3

benefits did Tribble report any improvement in his medical condition.

In 2001, in connection with a request from Tribble that the OWCP pay for treatments on his lower back, the OWCP referred him for an independent medical examination. On June 5, 2001, Dr. Ernest Rubbo evaluated Tribble and determined that he was able to return to work, subject to certain restrictions. Those restrictions included sitting, reaching, or climbing no more than four hours per day; and pushing, pulling, or lifting no more than twenty-five pounds. Dr. Rubbo did not indicate that Tribble's ability to drive an automobile was limited.

After Dr. Rubbo decided that Tribble could perform restricted work, the USPS, on October 4, 2001, offered Tribble a limited-duty position at the Dulles facility, tailored to his particular limitations. A commute to the Dulles facility would have required Tribble to drive approximately forty-nine minutes each way from his home in Rippon, West Virginia. Tribble declined the job at the Dulles facility, however, asserting that his medical condition made him unfit for the daily commute. In support of his decision, he submitted a statement from his attending physician that "any long drive [would] be bothersome to his sciatic nerve," and another statement from his family physician that he "would have considerable pain if required to drive that far." J.A. 890, 900.

B.

On December 4, 2003, Tribble was indicted by the grand jury in northern West Virginia on charges arising from the fraudulent receipt of federal workers' compensation benefits. See J.A. 19-34. The Indictment specified that Tribble had suffered a work-related injury on June 20, 1996, and that it had been determined that he was unable to perform his job with the USPS. It charged that, beginning on or about December 2, 2000, Tribble had devised a scheme and artifice to defraud the DOL and the USPS by making material and false representations concerning his medical condition (the "Scheme"). As part of the Scheme, Tribble allegedly had committed mail fraud by using the mail to receive blank Forms EN1032 from the OWCP and send fraudulently completed Forms to the OWCP; federal workers' compensation fraud by submitting fraudulent Forms EN1032 without reporting improvements in his medical condition; and wire fraud by receiving workers' compensation payments via wire transfers to his bank account.

Beginning on March 28, 2005, the district court conducted a four-day jury trial on the twenty-six counts in the Indictment. The Government presented, inter alia, evidence of Tribble's general capacity to perform work, evidence directed toward his ability to drive long distances, and evidence that he had planned to defraud the workers' compensation system.

5

1.

The prosecution's evidence of Tribble's capacity to perform strenuous physical activity included the following: Alfonzo Painter, a coworker of Tribble's at the Dulles facility, testified that the week after Tribble's 1996 injury, he had performed substantial handiwork on Painter's house with no sign of pain or physical limitation. David Leroy, a neighbor of Tribble's in Rippon, testified that, in the summer of 2001, he paid Tribble to install siding, and over the years saw Tribble perform extensive gardening and yard work. Multiple witnesses testified that Tribble regularly hunted deer and fished while receiving compensation benefits. Special Agent David Stelzer of the USPS's Inspector General (the "IG") testified that, in August of 2003, Tribble went on an all-day deep-sea fishing expedition, during which he caught and handled several large fish (including a forty-pound amber jack) with no sign of pain. The jury saw video from that expedition, and heard testimony from another government investigator that Tribble appeared physically robust while fishing, expressing an interest in continuing even after other participants had become fatigued and asked to return to shore. Stelzer further testified that, on the long automobile trip from West Virginia to the fishing expedition, Tribble had stopped at his brother's residence in Portsmouth, Virginia, and performed construction work on a nearby home; and that, on the return leg of that trip, Tribble stopped again to help

replace gutters and downspouts at his brother's Portsmouth home. Finally, IG Analyst Bruce Barry, who posed as a prospective employer and interviewed Tribble, testified that Tribble had discussed a trip to his parents' home in Kitty Hawk, North Carolina, after his deep-sea fishing trip, during which he spent three days clearing large trees and other debris left by a hurricane.

2.

The prosecution also introduced evidence that Tribble was able to drive the distance from Rippon to the Dulles facility. Special Agent Stelzer testified that Tribble had, on multiple occasions, driven approximately two hours and forty minutes to Pendleton County, West Virginia, to hunt deer. Stelzer also related that, in late August and early September 2003, Tribble, in the course of his deep-sea fishing trip, had driven approximately five hours to his brother's home in Portsmouth, another hour-and-a-half from there to his parents' home in Kitty Hawk, back to Portsmouth, and then back home to Rippon. IG Analyst Barry testified that, by Tribble's account, he had driven all night (from 12:30 a.m. until 7:30 a.m., with a brief break at his brother's home) to Kitty Hawk to help his parents clean up hurricane debris; and that he had driven to Warrenton, Virginia (fifty minutes from Rippon) to hunt. Tribble's wife testified that he makes the drive to Kitty Hawk approximately three times each year; that he can drive from Rippon to Warrenton;

7

and that they had recently taken a driving vacation to Wisconsin. In an October 23, 2003 exchange with another undercover investigator, Tribble asserted that he could drive about forty-five minutes — approximating the commute to Dulles that Tribble, in 2001, had told the USPS he could not endure. Importantly, Tribble's wife worked at the Dulles facility, and he was able, during the period after his injury, to regularly drive her to work and return to pick her up.

3.

The Government also presented evidence that Tribble planned to defraud the federal workers' compensation program. In September 1996, shortly after his injury and a month after their divorce, Tribble told his ex-wife that postal inspectors were likely to visit her, and that if she said nothing to them, she and Tribble could receive five million dollars. IG Analyst Barry, working undercover as an outfitter of hunting and fishing expeditions, pretended to be interested in hiring Tribble. Tribble expressed interest to Barry in working as a hunting guide or a crew member on a fishing boat, but refused to begin work until after he received an expected disability retirement award, stating that to do otherwise might jeopardize his benefits.

Robin Blake of the DOL's Inspector General posed as a nurse conducting an OWCP-ordered medical evaluation of Tribble. She examined and interviewed Tribble on October 23, 2003, shortly after

his deep-sea fishing expedition and his trip to remove his parents' hurricane debris. Tribble advised Blake that he could no longer hunt or fish, could undertake physical activity for brief periods of time only, and had "been reduced to a couch potato." J.A. 311. Tribble also informed Blake that he wanted to receive a disability retirement award, but not until December 5, 2003, when he would reach twenty years' employment with the USPS. Tribble sought favorable treatment from Blake on his benefits claim, and told her that, if he did not receive it, he would complain that the claim had been handled in an inappropriate manner.

4.

Tribble's evidence consisted primarily of testimony from various medical personnel. Dr. Albert Thomas, a pain management specialist who examined Tribble in March of 2003, testified that Tribble suffered pain in his lower back and that he had recommended Tribble continue to observe light duty restrictions. Elaina Putrello, a physical therapist who examined Tribble in February of 2004, testified that he could lift, push, pull, and carry less at the time she examined him than he could in 1999. Dr. Belote, Tribble's primary care physician, testified that Tribble's physical condition had declined from 1999 to 2004, and that even if Tribble could occasionally drive forty-five minutes or more, he was unable to do so on a daily basis.

Tribble's constructive amendment and prejudicial variance contentions are first raised on appeal, not having been presented to the district court and preserved at trial. As a result, two aspects of the trial proceedings that were peripheral at the time are now more significant. First, in his opening statement, the prosecutor, Assistant United States Attorney ("AUSA") Camilletti, discussed the issue of whether Tribble had suffered a work-related injury, stating as follows:

> Some of you are going to decide [Tribble] received a work related injury, and that's fine. Some of you are going to decide he didn't get any injury, and that's fine. What the Government is saying is that Mr. Tribble can get himself to work. And we're going to put on evidence to convince you that he can get himself to work.

J.A. 55. Second, during the presentation of the Government's case, another prosecutor, AUSA Morgan, questioned John Peters, Tribble's former supervisor at the Dulles facility, regarding the circumstances surrounding Tribble's injury. Morgan first asked about a letter Tribble had been presented around the time he was injured, notifying him that he could be terminated for chronic absenteeism. Peters responded that Tribble refused to accept the letter. When the letter was admitted into evidence, the following exchange ensued:

Q: The defendant was injured at the [Dulles] center?

A: No, he was not.

Q: Do you know when that happened in relation to him being provided with a notice of this removal?

A: A matter of minutes, I think. Within the hour after this letter was issued.

J.A. 100.

On March 31, 2005, after considering the trial evidence and the instructions, and deliberating for approximately an hour, the jury convicted Tribble on all twenty-six counts.

## C.

At sentencing, the district court was obliged to calculate the pecuniary loss Tribble's offenses had caused (in order to ascertain his offense level and to decide on restitution). In this regard, Tribble suggested that the amount of loss should not include benefits he received after being indicted on December 4, 2003. In support of that view, he advised the court that he had sought guidance from the Probation Office after the Indictment, concerning what he should do with the compensation payments he continued to receive. Tribble did not advise the court of any guidance he received, but he continued to accept compensation payments.

The court found that the amount of loss caused by Tribble's offenses included payments received from October 2001, when Tribble declined the USPS's limited-duty job offer, through the date of his convictions, totalling $92,082. The court sentenced Tribble to

11

restitution of that amount, in addition to twenty-four months of imprisonment.[4]

Tribble has appealed his convictions and sentence, and we possess jurisdiction under 28 U.S.C. § 1291.

## II.

When an appellant has failed to first present his contentions of error to the district court, we review them for plain error only. See Fed. R. Crim. P. 52(b); United States v. Olano, 507 U.S. 725, 731-32 (1993). A defendant seeking to overturn a ruling under the plain-error test bears the burden of showing (1) that an error occurred, (2) that it was plain, and (3) that it affected his substantial rights. Olano, 507 U.S. at 732. In any event, the correction of plain error lies within our discretion, which we

---

[4]The appellate briefs do not reflect, nor can we accurately discern from the Joint Appendix, exactly how much of the loss amount of $92,082 was attributable to benefits Tribble received after the Indictment. The court, however, calculated the loss as the sum of all benefits Tribble received from October 2001 through March 2005, and approximately forty percent of that period was after Tribble's December 2003 indictment. From that, we can conclude that if Tribble's post-indictment benefits had been excluded from the loss amount, his offense level would likely have fallen from fifteen to thirteen. See Presentence Investigation Report 9 (J.A. 970) (adding eight levels to Tribble's base offense level of seven, because loss was between $70,000 and $120,000); U.S.S.G. § 2B1.1(b) (2004) (providing for offense level increase of eight where loss is between $70,000 and $120,000, but only six where loss is between $30,000 and $70,000). An offense level of thirteen, along with Tribble's criminal history category of I, would produce an advisory Guidelines range of twelve to eighteen months, rather than the range of eighteen to twenty-four months that resulted from the sentencing court's computation. See U.S.S.G. ch. 5, pt. A (2004) (sentencing table).

12

"should not exercise . . . unless the error seriously affects the fairness, integrity or public reputation of judicial proceedings." Id. (internal quotation marks and alteration omitted).

We review a trial court's rulings on admissibility of evidence for abuse of discretion, and find error only if such a ruling was "arbitrary and irrational." United States v. Chin, 83 F.3d 83, 87 (4th Cir. 1996). In reviewing a contention concerning the sufficiency of evidence in support of a conviction, we view the evidence in the light most favorable to the Government, and inquire whether there is evidence that a reasonable finder of fact could accept as adequate and sufficient to establish the defendant's guilt beyond a reasonable doubt. See United States v. Burgos, 94 F.3d 849, 862 (4th Cir. 1996) (en banc); see also Glasser v. United States, 315 U.S. 60, 80 (1942) ("The verdict of a jury must be sustained if there is substantial evidence, taking the view most favorable to the Government, to support it."). Finally, we review de novo a sentencing court's interpretation of what constitutes a "loss" under the Guidelines. United States v. Hughes, 401 F.3d 540, 557 (4th Cir. 2005). If the Guidelines have been correctly applied, we will, in the absence of clear error, accept a sentencing court's calculation of loss. Id.

III.

A.

In pursuing this appeal, Tribble first contends that his convictions should be reversed because the Government constructively amended the Indictment against him. The Indictment specified that Tribble had suffered a workplace injury, and Tribble contends that AUSA Camilletti constructively amended the allegations by telling the jury, in his opening statement, that it could convict even though "[s]ome of you are going to decide he didn't get any injury." J.A. 55. Tribble's contention in this regard is without merit. In United States v. Floresca, 38 F.3d 706 (4th Cir. 1994), we discussed the applicable standard for whether an indictment has been constructively amended. We there recognized that "[a] constructive amendment to an indictment occurs when either the government (usually during its presentation of evidence and/or its argument), the court (usually through its instructions to the jury), or both, broadens the possible bases for conviction beyond those presented by the grand jury." 38 F.3d at 710.[5]

AUSA Camilletti's statement to the jury (to which no objection was made) was not a constructive amendment because it did not broaden the possible bases on which the jury could have convicted Tribble. Notably, Camilletti did not advise the jury that it could

_____

[5]There is no dispute in this proceeding as to the adequacy and correctness of the jury instructions.

14

convict Tribble based upon a finding that he did not sustain the initial injury claimed. What he said was quite different: that whether Tribble had suffered an injury in the first place was immaterial to proving the essential elements of the offenses charged. And, in that regard, he was correct. The Indictment specified that Tribble "suffered a work-related injury," but only as prefatory factual information in its Introduction. J.A. 19. As such, the jury was not obliged to determine, in order to convict, that Tribble had actually suffered the workplace injury mentioned in the Indictment. See United States v. Sarihifard, 155 F.3d 301, 309-10 (4th Cir. 1998) (noting that conviction requires only that jury unanimously find elements of offenses charged, not that it find every aspect of indictment to be true). Since the jury was not required to find that Tribble had suffered a work-related injury, Camilletti's reiteration of that point was not a constructive amendment. And, because there was no error in this regard, Tribble is unable to satisfy the plain error standard of review. See United States v. Olano, 507 U.S. 725, 732 (1993) (establishing that existence of error is first essential element of plain error).

### B.

In a closely related contention, Tribble maintains that, even if the Government did not constructively amend the Indictment, it prejudiced his trial by attempting to prove facts that materially

15

varied from those alleged. In this regard, he contends that the prosecution actually sought to prove that he did not suffer the work-related injury specified. This contention is also misplaced, however, and so we reject it as well.

The Government's theory of Tribble's guilt was that, during the period after he declined the USPS's limited-duty job offer at the Dulles facility, he improved enough to be able to commute to Dulles, and that he failed to report to the USPS that his medical condition had improved. Tribble acknowledges on appeal that the Government's proof focused on his ability to drive; indeed, he cites five instances in the Government's opening statement, and five in its closing argument, in which the prosecution asserted that Tribble's guilt was established because he "could get himself to work." Appellant's Br. 25-26 (citing J.A. 55, 65, 67, 69, 644, 652, 653, 654, 656, 657). By contrast, the record is void of any support for Tribble's view that the Government sought to prove he was never injured. Tribble relies on the prosecution's opening statement, but AUSA Camilletti's assertions therein were not inconsistent with the allegations of the Indictment.

Tribble also points to the testimony of John Peters, one of his supervisors at the Dulles facility. When AUSA Morgan asked Peters, "The defendant was injured at the center?" Peters replied, "No, he was not." But when Morgan asked Peters when Tribble's injury had occurred, Peters responded that it occurred "[w]ithin

16

the hour" after Tribble received the letter notifying him that his attendance at work was unsatisfactory.    J.A. 100.    Shortly thereafter, on cross-examination, Peters again acknowledged that Tribble had been injured.    Id. at 101.    Thus, the Government did not assert that Tribble had suffered no injury at all, and Peters did not take that position.    Since Tribble's contention that the prosecution tried to show he was never injured is inconsistent with the record, the proof did not vary from the Indictment.    And, as noted above, supra Part III.A, the absence of any error terminates our plain error analysis in the Government's favor.    See Olano, 507 U.S. at 732.

C.

Tribble's third contention of error relates to the trial court's decision to admit evidence of Tribble's conduct that occurred prior to the beginning of the Scheme.    The Indictment charged that the Scheme began on December 2, 2000, and the Government presented evidence of actions Tribble took before that date, including renovations he performed on his neighbor's house, and his statement to his ex-wife that if she said nothing to inquiring postal inspectors, they could receive five million dollars.    Tribble moved to exclude this evidence on the basis of Federal Rule of Evidence 404(b), which makes inadmissible "[e]vidence of other crimes, wrongs, or acts . . . to prove the character of a person in order to show action in conformity

17

therewith." The court ruled, however, that the pre-Scheme evidence was not offered to prove character, but to "lay the foundation as to how [Tribble] got where he was in 2000," when the Scheme began. J.A. 46. Thus, the court concluded that such evidence was "admissible for other purposes" than proof of character, as contemplated in Rule 404(b). In so ruling, the court relied on United States v. Chin, where we determined that Rule 404(b) does not bar the admission of evidence of acts that are "inextricably intertwined" with or "necessary preliminaries" to the crime charged. 83 F.3d 83, 88 (4th Cir. 1996). In this situation, the court was well within its discretion in ruling that the evidence of Tribble's pre-Scheme conduct satisfied that standard.

Tribble contends that the trial court's ruling was erroneous, but the basis for that contention is one we have already rejected. He maintains that the only purpose for the evidence of his pre-Scheme conduct was to show that he was never injured in the first place. Thus, in his view, the pre-Scheme evidence was not inextricably intertwined with, or a necessary preliminary to, the Scheme. As we have already explained, however, the record belies Tribble's position that the Government sought to show he was never injured. See supra Part III.A-B. And the trial court's ruling that the pre-Scheme evidence would assist the jury in understanding the offenses charged was neither arbitrary nor irrational. The pre-Scheme evidence was part and parcel of Tribble's general course

18

of conduct during the Scheme, and was thus "inextricably intertwined" with the Scheme itself. As a result, such evidence helped place the Scheme in context, and it shed light on the motives underlying the offenses charged. Cf. Old Chief v. United States, 519 U.S. 172, 186-89 (1997) (explaining importance of narrative integrity in admissibility determinations). In these circumstances, the trial court did not abuse its discretion in admitting evidence of Tribble's pre-Scheme conduct.

D.

Tribble's next appellate contention is that there was insufficient evidence to support the verdict of the jury. In this regard, Tribble maintains that the jury was not entitled to find that he had misrepresented his ability to commute to the Dulles facility, because even though the Government presented evidence of his ability to drive long distances, the evidence was insufficient to show that he could do so on a daily basis. He also asserts that the evidence established that his medical condition had worsened during the time he received compensation benefits, and the jury thus could not reasonably find that he failed to report improvements in his medical condition to the OWCP. As explained below, we reject both assertions.

First, there was ample evidence for the jury to conclude that Tribble misrepresented his ability to commute to Dulles. In making the contrary assertion, Tribble relies on Dr. Belote, his primary

19

care physician, who testified that Tribble could drive long distances occasionally, but could not do so every day. The jury, however, was not obliged to credit that testimony. The prosecution presented evidence that Tribble could and did drive long distances with no apparent limitations, and that he intended to defraud the workers' compensation program. The Government's evidence also showed that Tribble had misled his medical care providers in order to obtain diagnoses that would support his receipt of compensation benefits. On that basis, the jury was entitled to find that Dr. Belote, even if testifying in good faith, had been misled by Tribble and that his evidence was not reliable.

Second, Tribble maintains that there was insufficient evidence that he failed to report improvements in his medical condition, because his doctors had testified that his overall physical condition actually worsened during the time he received benefits, and the Government did not present contradictory evidence. His contention in this regard misses the point of the prosecution, however, which focused not on his general physical condition, but rather on his ability to drive himself to a USPS job at the Dulles facility. The evidence showed that, in 2001, Tribble advised the USPS he could not take a job at Dulles because he could not tolerate the necessary driving; that at some point thereafter he was able to tolerate such driving; and that he never told the Government that his ability to drive was better than he had

20

reported in 2001. Whatever the trajectory of Tribble's overall physical state, the jury was entitled to conclude that he failed to report an improvement in his ability to drive to work. There is accordingly no merit in Tribble's contention on this point.

E.

Finally, Tribble maintains that, in connection with sentencing, the district court erred in computing the amount of loss his offenses had caused, because its calculation of loss included benefits he received after he was indicted. He asserts that the correct measure of loss is the reasonably foreseeable pecuniary harm resulting from his offenses, and that it was not reasonably foreseeable that the Government would continue to pay benefits to him after he was indicted. Tribble thus contends that the court's loss computation should properly have included only those benefits paid prior to his indictment.

Tribble's contention on this point must also be rejected, because the sentencing court correctly applied the Guidelines in its handling of this issue. Under the Guidelines, the "actual loss" caused by an offense is "the reasonably foreseeable pecuniary harm that resulted from the offense." U.S.S.G. § 2B1.1, comment. (n.3(A)(I)) (2004). In this situation, it was entirely reasonable for Tribble to foresee that he would continue to receive benefits until he was actually convicted. Like any accused, a defendant charged with workers' compensation fraud is innocent until proven

guilty. Consistent therewith, the pertinent statute requires that compensation benefits be terminated when a beneficiary is convicted of a fraud scheme relating thereto. See 5 U.S.C. § 8148(a).[6] Tribble has failed to explain why the OWCP was required to deviate from that procedure here. Indeed, he does not contend that the OWCP (or any other government agency) gave him any basis for such an expectation. As a result, this final contention is also without merit.

## IV.

Pursuant to the foregoing, we reject Tribble's various assignments of error and affirm his convictions and sentence.

AFFIRMED

---

[6]Pursuant to the applicable statute, "[a]ny individual convicted of a violation of section 1920 of title 18 [workers' compensation fraud] . . . shall forfeit (as of the date of such conviction) any entitlement to any benefit such individual would otherwise be entitled to under this subchapter or subchapter III [including the federal workers' compensation benefits Tribble received] for any injury occurring on or before the date of such conviction." 5 U.S.C. § 8148(a).