**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

JERMAR BERNARD MARLON JONES,

*Defendant-Appellant.*

No. 12-4211

Appeal from the United States District Court
for the Eastern District of Virginia, at Norfolk.
Mark S. Davis, District Judge.
(2:11-cr-00083-MSD-FBS-1)

Argued: March 20, 2013

Decided: May 29, 2013

Before KING, DIAZ, and FLOYD, Circuit Judges.

Affirmed by published opinion. Judge Diaz wrote the opinion, in which Judge King and Judge Floyd joined.

**COUNSEL**

**ARGUED:** James R. Theuer, Norfolk, Virginia, for Appellant. Randy Carl Stoker, OFFICE OF THE UNITED STATES ATTORNEY, Norfolk, Virginia, for Appellee. **ON BRIEF:** Neil H. MacBride, United States Attorney, Alexandria, Virginia, Joseph E. DePadilla, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Norfolk, Virginia; Gillian R. Whitford-McHale, Law Student, UNIVERSITY OF VIRGINIA, Charlottesville, Virginia, for Appellee.

---

**OPINION**

DIAZ, Circuit Judge:

A federal jury convicted Jermar Jones of several criminal counts stemming from his participation in a scheme to arrange fraudulent marriages between Navy sailors and foreign nationals. The district court sentenced Jones to fifty-two months' imprisonment for each count of conviction, all to be served concurrently. On appeal, Jones asserts two Sixth Amendment errors. First, he contends the admission of hearsay statements made on recorded prison telephone calls violated the Confrontation Clause of the Sixth Amendment. Second, Jones argues the district court's refusal to strike a juror for cause violated his Sixth Amendment right to an impartial jury.

Jones also challenges two sentencing decisions by the district court. First, he asserts the district court erred in grouping the counts of conviction under the United States Sentencing Guidelines. Second, Jones argues that the district court erred in calculating the total loss amount under the Sentencing Guidelines.

As we explain, we conclude that the district court did not err at either the guilt or sentencing phases. Accordingly, we affirm.

I.

Jermar Jones served in the United States Navy for several years. Between 2006 and 2008, Jones and codefendant Justin Robbins orchestrated several fraudulent marriages between several of his shipmates and foreign nationals. The arrangements provided mutual benefits. The sailor would receive a monthly "Basic Allowance for Housing" ("BAH") stipend to support his spouse, while the foreign national would enjoy an opportunity to secure permanent residency in the United States. For his matchmaking services, Jones would either require the alien spouse to pay him a fee or demand receipt of his shipmate's "back pay"—funds paid to the sailor for the interim period between his marriage and the commencement of his BAH stipend.

Jones individually arranged the marriages of (1) Chitara Bowers and Otis Jones ("Otis"); (2) Ruben Ortiz and Devenee Duncan; (3) Darius Alexander and Nasara Smith; and (4) Andrea Wallace and Ashton Antoine. In addition to coordinating the nuptials, on multiple occasions Jones intimidated the participants to preserve the conspiracy. For example, when the Naval Criminal Investigative Service ("NCIS") began looking into the validity of the marriages, Jones threatened Alexander and Bowers and warned them not to cooperate, telling Bowers he would "handle" her and that he knew "where [you] stay at." J.A. 200.

A grand jury returned an eleven-count indictment charging Jones with one count of conspiracy to commit marriage fraud under 18 U.S.C. § 371 and 8 U.S.C. § 1325(c), four counts of aiding and abetting marriage fraud under 18 U.S.C. § 2 and 8 U.S.C. § 1325(c), three counts of aiding and abetting false claims to the United States Navy under 18 U.S.C. §§ 287 and

2, two counts of witness tampering under 18 U.S.C. § 1512(b)(3), and one count of making a false statement to the NCIS under 18 U.S.C. § 1001(a)(2).

During jury selection, Juror No. 42 disclosed that she was the host of a conservative radio talk show that discussed immigration issues. When asked about her views on illegal immigration, Juror No. 42 stated that "[m]y mom was naturalized . . . and she said, do you know, I came here legally and I did what I had to to come to this country legally, and everybody else should have to do the same thing. And I agree with that sentiment." J.A. 38-39. Juror No. 42 admitted that "[m]y show is conservative," J.A. 38, but gave assurances that she could decide the case impartially. The district court denied Jones's motion to strike the juror for cause.

At trial, most members of the conspiracy testified against Jones, claiming that Jones facilitated fraudulent marriages for them and others. The government also introduced three jailhouse phone conversations between Jones and his cousin Otis. One of these conversations included a three-way call between Jones, Otis, and Jones's uncle Austin Jones ("Austin"). The phone calls were recorded by the Chesapeake Correctional Center ("CCC"), where Otis was incarcerated. Before a call from a prisoner is connected, the inmate telephone system broadcasts an advisory to the parties that "all calls are subject to recording." J.A. 76.

During one jailhouse phone call, Jones told Otis "don't let em . . . try to break you, man. . . . We have everything safe for you[.]" J.A. 479. Similarly, Jones instructed Otis to "tell them men there is no fraud, no fraud. Tell your, tell your, tell your attorney to give me a call, man." J.A. 504. Jones also suggested that his family would support Otis should he return home to Grenada. Finally, Otis and Jones both expressed concern that NCIS agents would secure Bower's cooperation.

Perhaps the most damaging statement occurred when Austin joined one of the jailhouse calls and told Otis:

Tell them you didn't conspire to do anything; you just, you, you, you married this woman because you saw her, you fell in love with her and all this stuff, you know, and just tell him exactly. That's how it is; you didn't conspire, that's not conspiracy!

J.A. 491. Defense counsel objected that the statements by Otis and Austin were inadmissible hearsay. The district court, however, admitted the statements under the coconspirator exclusion to hearsay, Fed. R. Evid. 801(d)(2)(E), and to provide context to the admissible statements of Jones.

After a four-day trial, the jury convicted Jones on all counts. At sentencing, Jones objected to the presentence report ("PSR") that only grouped one of the two witness tampering counts (Count 10) with the false claims counts (Counts 6–8). The district court overruled that objection, sentenced Jones to fifty-two months' imprisonment on each count of conviction, all to run concurrently, and ordered $134,702.39 in restitution.

## II.

We first address Jones's objection to the admission of the prison telephone calls. Before the district court, Jones tied his objection to the non-constitutional hearsay prohibition of Federal Rule of Evidence 802. On appeal, Jones has switched course and raised a Confrontation Clause challenge. We generally limit our review of claims not properly preserved in the district court to plain error. Jones, however, argues that plain error review should not apply because any Confrontation Clause objection would have been futile after the district court ruled the evidence admissible under the coconspirator exclusion to hearsay. We need not decide that question for, as we explain below, no Confrontation Clause violation occurred.

The Sixth Amendment provides: "In all criminal prosecutions, the accused shall enjoy the right to . . . be confronted

with witnesses against him." This constitutional right to confrontation bars extrajudicial "testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." *Crawford v. Washington*, 541 U.S. 36, 53-54 (2004).

While Jones concedes that his statements on the phone calls were admissible under the party opponent exception to hearsay, *see* Fed. R. Evid. 801(d)(2)(A), he challenges the admission of the statements made by Otis and Austin during the calls. Specifically, Jones now contends that Otis and Austin gave "testimonial" statements on the prison phone calls without Jones having had the opportunity to cross-examine the declarants before or at trial. We disagree with Jones's argument.

While the Supreme Court has postponed "any effort to spell out a comprehensive definition of 'testimonial,'" *Michigan v. Bryant*, 131 S. Ct. 1143, 1153 (2011) (internal quotations omitted), it has limited the Confrontation Clause's reach to those statements "made under circumstances which would lead an objective witness reasonably to believe that the statements would be available for use at a later trial." *Crawford*, 541 U.S. at 52.\* We have paraphrased this standard to mean that statements are testimonial when "a reasonable person in the declarant's position would have expected his statements to be used at trial—that is, whether the declarant would have expected or intended to 'bear witness' against another in a later proceeding." *United States v. Udeozor*, 515 F.3d 260, 268 (4th Cir. 2008).

In conducting that contextual inquiry, we reject the propo-

---

\*The Court in *Bryant* emphasized that "the most important instances in which the Clause restricts the introduction of out-of-court statements are those in which state actors are involved in a formal, out-of-court interrogation of a witness to obtain evidence for trial." 131 S. Ct. at 1155.

sition advanced by Jones that a declarant's knowledge that he is being recorded is dispositive. Even if Otis and Austin were aware that the prison was recording their conversation, a declarant's understanding that a statement could potentially serve as criminal evidence does not necessarily denote "testimonial" intent. *See Davis v. Washington*, 547 U.S. 813, 822 (2006) (holding statements made during 911 emergency phone call were non-testimonial when uttered only "to enable police assistance to meet an ongoing emergency"); *United States v. Shavers*, 693 F.3d 363, 390, 395-96 (3d Cir. 2012) (holding that inmates who received advisory that prison phone calls were recorded did not give "testimonial" statements); *United States v. Ellis*, 460 F.3d 920, 926 (7th Cir. 2006) ("[T]he mere fact a person creating a business record (or other similar record) knows the record might be used for criminal prosecution does not by itself make that record testimonial.").

Put another way, just because recorded statements are used at trial does not mean they were "created for trial." *United States v. Cabrera-Beltran*, 660 F.3d 742, 752 (4th Cir. 2011). As with 911 emergency services, a hospital, or a business, a prison has a significant institutional reason for recording phone calls outside of procuring forensic evidence—i.e., policing its own facility by monitoring prisoners' contact with individuals outside the prison. To adopt the rule Jones proposes would require us to conclude that all parties to a jail-house phone call categorically intend to bear witness against the person their statements may ultimately incriminate.

Otis and Austin certainly did not speak on these phone calls for that reason. Nowhere in these casual conversations, which primarily concerned Otis's emotional state and the prison conditions at CCC, do either Otis or Austin demonstrate an intent to 'bear witness' against Jones. In fact, any incriminating statement made during these conversations tended to also incriminate them in the fraudulent scheme.

Because we are satisfied that the statements made by Otis and Austin on the prison telephone calls were not testimonial, their admission did not violate the Confrontation Clause.

### III.

Next, Jones asserts that the decision by the district court to impanel Juror No. 42 violated his Sixth Amendment right to a trial by an impartial jury. Jones claims the juror harbored a "conservative" bias toward the issue of illegal immigration, and as his criminal conduct involved facilitating illegal immigration through marriage fraud, that bias affected the juror's determination of his guilt. We disagree with Jones.

"It is the settled law of this circuit that a district judge retains a very broad discretion in deciding whether to excuse a juror for cause and his decision will not be overturned except for manifest abuse of that discretion." *United States v. Turner*, 389 F.3d 111, 115 (4th Cir. 2004) (internal quotations omitted). "In selecting a jury, the trial judge is in the best position to make judgments about the impartiality and credibility of potential jurors based on the judge's own evaluations of responses to questions." *Cabrera-Beltran*, 660 F.3d at 749 (internal quotations omitted).

The district court properly exercised its discretion here. To begin with, Juror No. 42's belief that aliens should comply with immigration laws, and her work as a conservative radio talk show host where she discussed such issues, were not a per se bar to serving as a juror in this case. Because jurors will have opinions from their life experiences, it would be impractical for the Sixth Amendment to require that each juror's mind be a tabula rasa:

> To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to

> establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.

*Murphy v. Florida*, 421 U.S. 794, 800 (1975) (internal quotations omitted).

Here, Juror No. 42 said—not once, but three times—she could do just that. After the district court explained the purpose of voir dire, the juror acknowledged: "I know that what you're trying to do is figure out if someone could serve impartially. I would—I believe that I could according to the evidence and the Constitution, yes." J.A. 38. The court asked Juror No. 42 whether, if a trial involved allegations of an individual facilitating illegal immigration, she could "listen fairly and impartially to the evidence and render a fair and impartial verdict based only on the evidence that you hear here in the courtroom?" J.A. 39. The juror responded: "Yes. That's the beauty of the Constitution, is you're innocent until proven guilty." J.A. 39. The court then secured a final reassurance of impartiality: "So is there . . . [n]o doubt in your mind? You think you can render a fair and impartial . . . verdict if selected to serve on this jury?" J.A. 40. Juror No. 42 responded: "Yes." J.A. 40.

Although a juror's avowal of impartiality is not dispositive, *see Murphy*, 421 U.S. at 800, "if a district court views juror assurances of continued impartiality to be credible, the court may rely upon such assurances in deciding whether a defendant has satisfied the burden of proving actual prejudice." *United States v. Corrado*, 304 F.3d 593, 603 (6th Cir. 2002) (internal quotations omitted). Because Jones fails to cast doubt on Juror No. 42's assurance that she could set aside any opinion she may have had on the case, *see id.*, we defer to the district court's determination that she could serve impartially.

IV.

Jones next challenges the district court's calculation of the advisory sentencing range under the United States Sentencing Guidelines, claiming that the court incorrectly grouped only one of the witness tampering counts (Counts 9-10) with the aiding and abetting false claims counts (Counts 6–8). "The grouping of multiple convictions, pursuant to USSG § 3D1.2, involves a legal interpretation of guidelines terminology, and we review grouping issues de novo." *United States v. Bolden*, 325 F.3d 471, 495 (4th Cir. 2003). Jones argues that the court should have grouped both witness tampering counts with the false claims counts, or alternatively, should have grouped Count 9 with the conspiracy and marriage fraud counts (Counts 1–5). Had the district court grouped both witness tampering counts, either with the false claims counts or with the conspiracy counts, Jones's final guideline range would have been lower.

In addressing Jones's arguments, we consider whether the relevant Sentencing Guidelines, USSG §§ 3C1.1, 3D1.2, require a district court to group only the "most serious" of multiple obstruction of justice convictions (here the witness tampering counts) with the underlying offense—i.e. "the offense with respect to which the obstructive conduct occurred." USSG § 3C1.1 cmt. n. 8. In answering this question, we follow the thread left by the district court and make our way through the labyrinth of Sentencing Guidelines provisions that govern Jones's claim of error.

The Sentencing Guidelines provide two methods by which a district court can punish a defendant for committing an "obstruction of justice" offense such as witness tampering. First, a court may sentence a defendant on an obstruction of justice conviction itself. *See* USSG § 2J1.2(a). Second, where there is no conviction for obstruction of justice, a court may still apply a two-level enhancement to another conviction if it finds by a preponderance of the evidence that a defendant

obstructed justice with respect to that underlying offense. *See id.* § 3C1.1.

Where, as here, the defendant is convicted of both an obstruction offense (witness tampering) and the underlying offense (aiding and abetting false claims), the Sentencing Guidelines provide that "the count for the obstruction offense will be grouped with the count for the underlying offense[.]" *Id.* § 3C1.1 cmt. n. 8. From there, the Guidelines direct that "[t]he offense level for that group of closely related counts will be the offense level for the underlying offense increased by the 2-level adjustment specified by this section, or the offense level for the obstruction offense, whichever is greater." *Id.*

In other words, when a defendant is convicted of both an obstruction of justice offense and the underlying offense, the Sentencing Guidelines group the two counts and either apply a two-level enhancement to the underlying offense or apply the offense level for the obstruction conviction, but never both. In this context, grouping serves two purposes: (1) obviating a factual finding of obstruction of justice at sentencing when the trier of fact has already reached such a finding at the guilt phase; and (2) preventing the "double counting" that would occur if a district court applied both a base offense level to the obstruction conviction and a two-level obstruction enhancement to the underlying offense. *See id.* § 3D1.2 cmt. n. 5.

USSG § 3C1.1 Application Note 8 provides that a court should group obstruction offenses under USSG § 3D1.2(c), which groups criminal counts of conviction "[w]hen one of the counts embodies conduct that is treated as a specific offense characteristic in, or other adjustment to, the guideline applicable to another of the counts." Because witness tampering serves as an adjustment (two-level obstruction enhancement) to the false claims guideline, it must be grouped.

However, where, as here, there are multiple obstruction convictions to group (in the form of two witness tampering counts), USSG § 3D1.2(c) Application Note 5 qualifies subsection (c):

> Sometimes there may be several counts, each of which could be treated as an aggravating factor to another more serious count, but the guideline for the more serious count provides an adjustment for only one occurrence of that factor. In such cases, only the count representing the most serious of those factors is to be grouped with the other count.

Here there were two witness tampering counts, each of which could have supported a two-level enhancement to the more serious count of aiding and abetting false claims. But because the Sentencing Guidelines permit only one obstruction of justice enhancement under USSG § 3C1.1, USSG § 3D1.2 Application Note 5 directs the district court to group only the count "representing the most serious" obstructive conduct. *See United States v. Beckner*, 983 F.2d 1380, 1385 (6th Cir. 1993) (grouping only one of two "resisting arrest" counts with underlying offense pursuant to Application Note 5).

The district court meticulously followed this analysis to this point and found that because the witness tampering offense against Bowers (Count 10) "caused the potential witness to be in fear and physically upset, whereas Count 9 involved witness tampering with no evidence of a significant emotional impact on the target . . . Count Ten is the most serious of the witness tampering counts." J.A. 590. Accordingly, the district court grouped Count 10.

We agree that this was the proper way to group multiple obstruction of justice convictions under the Sentencing Guidelines. Jones's insistence that the district court should have grouped both obstruction convictions with the underlying offense overlooks (1) USSG § 3C1.1 Application Note 8,

which provides that the grouping of obstruction of justice convictions should occur pursuant to USSG § 3D1.2(c); and (2) USSG § 3D1.2 Application Note 5, which requires a district court to group only the "most serious" of the obstruction convictions.

We also reject Jones's alternative argument that even if the district court was correct to group only Count 10, it should nevertheless have grouped Count 9 with the counts for conspiracy and aiding and abetting marriage fraud (counts 1–5). Jones overlooks that USSG § 3C1.1 Application Note 8 provides that a court may group an obstruction conviction with only one "underlying offense": "the offense with respect to which the obstructive conduct occurred." Here the offense underlying the witness tampering counts was the aiding and abetting of false claims, therefore the obstruction counts were eligible for grouping only with those counts.

V.

Finally, we address the challenge to the district court's total loss calculation caused by Jones's fraudulent scheme. In a conviction for false claims against the United States, USSG § 2B1.1(b) escalates the applicable offense level based on the amount of total loss attributable to the defendant's conduct. In this case, the amount of loss calculated by the district court ($134,702.39) resulted in a ten-level increase in the offense level. *See* USSG § 2B1.1(b)(1)(F). The district court also ordered Jones to pay this same amount in restitution.

"The determination of loss attributable to a fraud scheme is a factual issue for resolution by the district court, and we review such a finding of fact only for clear error." *United States v. Allmendinger*, 706 F.3d 330, 341 (4th Cir. 2013) (internal quotations omitted). In calculating the total loss attribution, a district court "need only make a reasonable estimate of the loss." USSG § 2B1.1 cmt. n. 3(C). In reaching this estimate, "'[a]ctual loss' means the reasonably foreseeable pecu-

niary harm that resulted from the offense." *Id.* cmt. n. 3(A)(i). "'[R]easonably foreseeable pecuniary harm' means pecuniary harm that the defendant knew or, under the circumstances, reasonably should have known, was a potential result of the offense." *Id.* cmt. n. 3(A)(iv).

The district court estimated that Jones defrauded the United States out of $134,702.39 of BAH funds. Jones contends that he should not be responsible for $28,844.40 of that amount, because Bowers and Alexander received these payments long "after they confessed to the [NCIS] that their respective marriages were fraudulent." Appellant's Br. 17. In Bowers's case, she received BAH benefits for seven months after confessing, while Alexander received benefits for fourteen months. Jones argues that he could not have reasonably foreseen that Bowers and Alexander would have continued to accept BAH benefits after confessing to the fraud.

We addressed a similar argument in *United States v. Tribble*, 209 F. App'x 332 (4th Cir. 2006), where the defendant falsely claimed workers' compensation from the United States Postal Service. After conviction and on appeal, Tribble claimed that the district court erred in its "actual loss" calculation by including funds he received after indictment—as the receipt of these funds was not reasonably foreseeable. We rejected that argument:

> In this situation, it was entirely reasonable for Tribble to foresee that he would continue to receive benefits until he was actually convicted. Like any accused, a defendant charged with workers' compensation fraud is innocent until proven guilty. Consistent therewith, the pertinent statute requires that compensation benefits be terminated when a beneficiary is convicted of a fraud scheme relating thereto.

*Id.* at 341.

It is true that the defendant in *Tribble* continued to deny criminal wrongdoing, whereas the coconspirators in this case did not. Nevertheless, it is entirely foreseeable that losses caused by a fraudulent scheme will not cease the moment that coconspirators confess to the fraud. *Cf. Allmendinger*, 706 F.3d at 341-42 (affirming calculation of losses suffered by investors even after defendant sold ownership interest in investment company that operated fraudulent schemes); *United States v. Taylor*, 41 F. App'x 380, 383 (10th Cir. 2002) (affirming calculation of losses when coconspirator continued to embezzle money even after defendant left employment at the bank).

A confession is neither a final resolution of liability nor a self-initiating termination to a criminal enterprise. In this case, the confessions occurred during an investigation, at which point Alexander and Bowers could still have recanted, and NCIS agents had yet to establish the culpability of the other spouses and coconspirators. Jones was also actively obstructing the NCIS investigation to ensure that the fraud continued, making specious his claim that he could not foresee that very result.

Moreover, federal regulations did not require the Navy to terminate BAH payments the moment Alexander and Bowers confessed, nor for that matter do the regulations establish any particular timetable for terminating payments in cases of fraud. *See* Joint Federal Travel Regulations, ch. 10, ¶ U10106. We therefore conclude that it was reasonably foreseeable that the Navy would not terminate BAH payments until it had finished its investigation and formally determined that the BAH funds had been illicitly obtained. While one can quibble over whether the Navy acted with utmost dispatch to stop the payments to Alexander and Bowers, we nonetheless believe that the amount estimated by the district court was a foreseeable loss caused by the fraud.

The Sentencing Guidelines recognize that computing the losses caused by a fraud will often be an inexact calculation,

which is why a "court need only make a reasonable estimate." USSG § 2B1.1 cmt. n. 3(C); *see also United States v. Miller*, 316 F.3d 495, 503 (4th Cir. 2003). Because the district court reached a reasonable estimate in its loss calculation, we reject this argument.

## VI.

For the foregoing reasons, we affirm the judgment of the district court.

*AFFIRMED*