52 A.3d 148

**Travon David DAVIS**

v.

**STATE of Maryland.**

**No. 953, Sept. Term, 2011.**

Court of Special Appeals of Maryland.

Sept. 4, 2012.

300

Joshua M. Salzman (William, Cutler, Pickering, Hale & Dorr, LLP, Washington, DC, Paul B. DeWolfe, Public Defend-

er, A. Stephen Hut, Jr., Rockville, MD), on the brief, for appellant.

Robert Taylor, Jr. (Douglas F. Gansler, Atty. Gen., on the brief) Baltimore, MD, for appellee.

Panel: WOODWARD, BERGER, IRMA S. RAKER (Retired, Specially Assigned), JJ.

WOODWARD, J.

On February 4, 2011, Travon David Davis, appellant, was indicted on one count of first degree burglary and one count of conspiracy to commit first degree burglary. On April 27, 2011, appellant sought a continuance in the Circuit Court for Montgomery County so that appellant's alleged juvenile co-perpetrator, Jerquan H., could testify at trial. The circuit court denied appellant's motion for a continuance, and, following a two-day jury trial, appellant was found guilty of first degree burglary and was acquitted of conspiracy to commit first degree burglary.

On May 9, 2011, appellant moved for a new trial on three grounds: (1) the verdict was "irreconcilably inconsistent"; (2) the denial of appellant's motion for a continuance violated his Sixth Amendment rights; and (3) the evidence was insufficient to sustain the first degree burglary conviction. The circuit court denied appellant's motion for a new trial in an order dated May 31, 2011. On June 15, 2011, appellant was sentenced to eight years' imprisonment, with all but 18 months suspended, and five years probation upon release.

On appeal, appellant presents three questions for our review,[1] which we have rephrased:

---

1. In his brief, appellant also argues that his conviction for first degree burglary should be reversed, because it was "irreconcilably inconsistent" with his acquittal on the charge of conspiracy to commit first degree burglary. Appellant has since conceded that this argument is without merit in light of the Court of Appeals' recent decision in *McNeal v. State*, 426 Md. 455, 44 A.3d 982 (2012), which permits factually inconsistent verdicts in criminal jury trials.

I.    Did the circuit court abuse its discretion in denying appellant's motion for a continuance?

II.   Did the trial court violate appellant's Sixth Amendment Confrontation Clause rights when it admitted an audiotape of Jerquan's interrogation?

III.  Was the evidence legally insufficient to sustain appellant's conviction for first degree burglary?

For the reasons set forth herein, we answer all of the above questions in the negative and therefore affirm the judgment of the circuit court.

## BACKGROUND

### The Incident

Because appellant is challenging the sufficiency of the evidence to sustain his conviction for first degree burglary, we review and recite the facts in the light most favorable to the prosecution. *Moye v. State*, 369 Md. 2, 12, 796 A.2d 821 (2002).

On December 29, 2010, Mildred Detwiler called 911 to report that two men were breaking into her house. Detwiler testified at trial that "two young black men" rang her doorbell at approximately 11:30 a.m., and when she did not answer, she observed the two men walk around to the back of her house. As Detwiler walked to the back of her house, she saw one of the men attempt to push up on the dining room window in the back of the house, and then saw both of them walk around to the back porch and look through the lattice underneath the porch. Both men then walked onto the deck and looked at two other windows. While one man stayed on the deck, the other walked up the steps to her back porch screen door and pushed his hand through the screen on the bottom of the door. According to Detwiler, after pushing his hand through the screen, the man was "feeling up the side of the [ ] door to see . . . what was holding the door" and "found the latch on the door." While this was occurring, the other man was "just standing" on the deck. Detwiler called 911 and went across

the street to her neighbor's home. Once Detwiler arrived at her neighbor's home, the police arrived "almost immediately," and she observed a police officer jump out of his car and start running.

Officer Michael Kane responded to Detwiler's 911 call and, upon arrival, observed two "black male subjects standing on the side yard." Officer Kane made eye contact with the two men, who were walking toward him, and told them to stop. At this point, the two men turned and ran in the opposite direction and Officer Kane pursued them. Officer Mauricio Veiga was off-duty in the area and observed two men running and "looking back at the cruiser" driven by Officer Kane. Officer Veiga pursued the two men and saw them run into the backyard of a townhouse, bang on the sliding glass door, look back, and then gain entry into the house. After verifying the address of the townhouse, Officer Veiga called for assistance and, eventually, the two men came out of the townhouse in different clothing. The two men, appellant and Jerquan, who was then 17 years old, were arrested.

Following their arrest, appellant and Jerquan provided separate recorded statements to Detective Thomas Dufek. In his statement, Jerquan initially denied any wrongdoing, but later stated that "we did crawl through the screen," but "I didn't try to break in" and "I wasn't never going to go in the house." Jerquan also stated that "I just crawled through the door" and that appellant was "not really in this." In recounting the events of that day, Jerquan used both "we" and "I." In his statement, appellant said that their "intentions [weren't] to hurt [any]body," that they did not think anybody was home, and that they "messed up" and "[were] leaving."

## Motion for a Continuance

Appellant's trial was scheduled for April 27, 2011, while Jerquan's juvenile proceedings were scheduled for June 28, 2011. On the first day of appellant's trial, defense counsel moved for a continuance before the Administrative Judge, because Jerquan, who "still ha[d] a 5th Amendment privilege," refused to testify until after his adjudication. According to

defense counsel, Jerquan would testify that appellant "had no involvement in this incident." The State opposed the continuance and offered to stipulate to the contents of Jerquan's statement, which the State characterized as both exculpatory and incriminating. The State also cited to Maryland Rule 2–508(c), a rule of civil procedure regarding continuances and absent witnesses, for the proposition that, if "the parties are willing to stipulate what the actual witness would testify to, the Court may deny the motion." Defense counsel and the State were unable to reach an agreement on the contents of the stipulation and on a new trial date.

The Administrative Judge denied the motion for a continuance. In doing so, the court found that Jerquan was not "absent" under Rule 2–508(c) and that the State was "willing to stipulate to substantially everything that [defense counsel] wanted [Jerquan] to have said if he didn't assert the 5th [Amendment]."

### The Trial and Verdict

At the end of the first day of trial, the State indicated that it planned to introduce an audiotape of Jerquan's interrogation. In response, defense counsel stated: "I'm accepting the statement being played, but I'm not giving up any rights that I had as a result of the continuance, when I wanted the live body here." The State then indicated that it planned to play the interrogation as part of its case-in-chief, and the trial judge stated that it would come in "since both sides want it." Jerquan was then called to testify and invoked his Fifth Amendment right to silence, and the court found him to be unavailable.

The next day, the State introduced into evidence the audiotape of Jerquan's interrogation during its direct examination of Detective Dufek. The State also played a portion of the audiotape of appellant's interrogation. When each of these audiotapes were offered into evidence, defense counsel stated that he had "[n]o objection."

At the close of the State's case-in-chief and at the close of all evidence, defense counsel moved for a judgment of acquittal; both motions were denied. The jury returned a verdict of guilty on the charge of first degree burglary and not guilty on the charge of conspiracy to commit first degree burglary. On May 9, 2011, appellant moved for a new trial, which was denied on May 31, 2011. The court also denied appellant's motion to reconsider this ruling.

As previously stated, on June 15, 2011, appellant was sentenced to eight years' imprisonment, with all but 18 months suspended, and five years probation upon release. This timely appeal followed. Additional facts will be set forth herein to resolve the questions presented.

## *DISCUSSION*

### I.

Appellant argues that the trial court denied his rights under the Sixth Amendment and Article 21 of the Maryland Declaration of Rights when it denied his motion for a continuance to obtain Jerquan's exculpatory testimony. According to appellant, under *Jackson v. State*, 214 Md. 454, 459, 135 A.2d 638 (1957), a trial court abuses its discretion in denying a continuance when the requesting party has shown: (1) "that he had a reasonable expectation of securing the evidence of the absent witness or witnesses within some reasonable time"; (2) "that the evidence was competent and material, and he believed that the case could not be fairly tried without it"; and (3) "that he had made diligent and proper efforts to secure the evidence".[2]

---

2. Appellant also argues that the trial court abused its discretion by failing to consider any of the above three factors in denying appellant's continuance, and instead denying the motion because Jerquan was not "absent" under Maryland Rule 2–508. Appellant asserts that Rule 2–508, a rule of civil procedure, is not applicable to the instant criminal case. However, it is "well established that an appellate court will normally affirm a trial court on a ground adequately shown by the record, even though that ground was not the one relied upon by the trial court." *Robeson v. State*, 285 Md. 498, 503–04, 403 A.2d 1221 (1979); *see also Pope v. Bd. of Sch. Comm'rs of Baltimore City*, 106

Appellant argues that he made a sufficient showing of each of the *Jackson* factors.

First, appellant argues that "[t]here was a reasonable likelihood that [Jerquan] would have been available within a reasonable amount of time." In support of this proposition, appellant notes that Jerquan's trial was scheduled for the end of June 2011, two months after appellant's trial date. Appellant claims that "there was a reasonable likelihood that [Jerquan] would cease to have a Fifth Amendment basis for refusing to testify after that point." Because "the alleged co-perpetrator was likely to have the charges against him resolved within a timely period," appellant concludes that "a continuance was entirely reasonable and warranted."

With respect to the second *Jackson* criteria, appellant argues that "[t]he case could not be fairly tried without [Jerquan]'s testimony," as the testimony "would have confirmed the heart of the defense ... that [appellant] was present, but not a participant in the burglary." According to appellant, Jerquan's recorded interrogation was not an "adequate substitute for [appellant's] right to call [Jerquan] as a live witness," because: (1) defense counsel's proffer of Jerquan's likely testimony "was more exculpatory than the tape alone"; (2) "a videotape is not an adequate or constitutionally sufficient substitute for live testimony"; and (3) Jerquan would have been able to clarify his inculpatory use of "we" in his videotaped statement.

Finally, appellant asserts that defense counsel was diligent in his efforts to secure Jerquan's testimony. Appellant notes that defense counsel prepared a subpoena and contacted Jerquan's mother prior to trial, and that Jerquan was already under subpoena by the State.

---

Md.App. 578, 591, 665 A.2d 713 (1995), *cert. denied*, 342 Md. 116, 673 A.2d 707 (1996) (stating that "it is within our province to affirm the trial court if it reached the right result for the wrong reasons"). As explained *infra*, because appellant did not meet his burden to show all three factors required by *Jackson v. State*, 214 Md. 454, 459, 135 A.2d 638 (1957), there is a sufficient legal basis for upholding the trial court's denial of appellant's motion for a continuance.

In response, the State argues that "[t]he trial court was within its discretion in denying a defense continuance request." With respect to the three *Jackson* requirements, the State makes the following arguments: (1) appellant failed to show that he had a reasonable expectation of securing Jerquan's live testimony in a reasonable time, because one codefendant does not have the right to be tried before or after another co-defendant and Jerquan was not going to trial for two months and had many available remedies to exhaust before he could no longer invoke his Fifth Amendment right to silence; (2) Jerquan's testimony was not "necessary," as it "would be substantially the same as his recorded statement to the police"; and (3) it is unclear whether appellant subpoenaed Jerquan prior to trial.

■■■ "The decision of whether to grant a request for continuance is committed to the sound discretion of the court." *Abeokuto v. State,* 391 Md. 289, 329, 893 A.2d 1018 (2006) (citing *Ware v. State,* 360 Md. 650, 706, 759 A.2d 764 (2000)). A trial court's ruling on a continuance will not be disturbed absent an abuse of discretion, which was prejudicial to the party requesting the continuance. *Jackson,* 214 Md. at 459, 135 A.2d 638. To show an abuse of discretion, the party that requested the continuance must show: (1) "that he had a reasonable expectation of securing the evidence of the absent witness or witnesses within some reasonable time"; (2) "that the evidence was competent and material, and he believed that the case could not be fairly tried without it"; *and* (3) "that he had made diligent and proper efforts to secure the evidence." *Id.; see also Fontaine v. State,* 134 Md.App. 275, 298, 759 A.2d 1136 (2000).

In our view, appellant failed to carry his burden to show (1) that he had a reasonable expectation that Jerquan would testify within some reasonable time, and (2) that the case "could not be fairly tried" without Jerquan's live testimony.

■■■ Under *Jackson,* the first factor that appellant must show in order to be entitled to a continuance is that "he had a reasonable expectation of securing the evidence of the absent

witness or witnesses within some reasonable time." 214 Md. at 459, 135 A.2d 638. Here, it is undisputed that Jerquan was not going to waive his Fifth Amendment privilege and testify at appellant's trial. In *Tann v. State,* 43 Md.App. 544, 548, 406 A.2d 448 (1979), this Court held "that where the absent witness is also a co-defendant and there is no showing that he will waive his privilege against self-incrimination and exonerate the appellant, the trial judge may deny the postponement of a trial."

Appellant, nevertheless, asserts that, because Jerquan's trial was scheduled only two months after appellant's trial, "there was a reasonable likelihood that [Jerquan] would cease to have a Fifth Amendment basis for refusing to testify after that point." Appellant's contention overlooks the fact that Jerquan's Fifth Amendment privilege would not end with his trial, unless he was found not involved. If Jerquan was found involved, his Fifth Amendment privilege would continue through disposition and *all subsequent appeals.* Any appeal to this Court could take anywhere from nine months to over a year. At the hearing on appellant's motion for a continuance, there was no indication that Jerquan was going to enter a plea of involved. Therefore, because Jerquan was not going to waive his Fifth Amendment privilege to testify at appellant's trial and there was no indication that he would enter a plea of involved, we conclude that appellant failed to show that Jerquan would be available to testify "within some reasonable time." *See Jackson,* 214 Md. at 459, 135 A.2d 638.

■ Regarding the second *Jackson* factor, the State advised the trial court, at the hearing on appellant's motion for a continuance, that it was willing to stipulate to the entirety of Jerquan's recorded interview. Defense counsel responded, however, that "[t]here's lots more to it than just the bare statement." The following colloquy then ensued among the court, defense counsel, and the prosecutor:

THE COURT: ... So, the reason I'm asking is if there is a specific proffer of testimony I'll be glad to, you know, hear that and see if the State will stipulate to it. If

there's not a specific proffer of testimony, it seems to me that there's a pretty comprehensive statement made by this potential witness and that that statement seemed to cover the Defense.

[DEFENSE COUNSEL]: Your Honor—I'm sorry.

THE COURT: So, absent some specific proffer of something that's not in that statement that the State is not willing to stipulate to, I'm inclined to deny the request for a postponement, so.

[DEFENSE COUNSEL]: Okay, I can supply the date— Just one—The Court's indulgence. That my client and what would be the co-defendant spent the night together. That they were together the entire day before this event occurred. That there was no discussion between them whatsoever about breaking into anyone's house, including the particular victim in this particular case.

That my client was merely just standing there. **That the whole idea in breaking into the house was solely that of the juvenile codefendant.**

[PROSECUTOR]: Except for the last statement—

THE COURT: All right, well hold on a second. And are you telling, are you representing to me that you have a good faith basis to represent that that would be the testimony of this witness were he to testify?

[DEFENSE COUNSEL]: I do based on the statement, based on conversations that I've had—

THE COURT: All right.

[DEFENSE COUNSEL]:—in this case.

THE COURT: All right. And [prosecutor], you take exception to some part of that proffer.

\*　　\*　　\*

[PROSECUTOR]: I wouldn't, I have **no problem with everything [defense counsel] said up to the point where he said, "and the whole idea was by [Jerquan],"** and I don't think, he can state the last quote again.

[DEFENSE COUNSEL]: And **was solely, I think I said it was solely his idea and my client had no involvement with it whatsoever.**

[PROSECUTOR]: Well, you can, again, **if you take out that last part I'll stipulate.** I think he said seven or eight things. **That last part, how could we, you know, I can't stipulate to that because you know, [appellant] is on the scene too.** To put that information in front of the jury, and I don't think, I think defense counsel may have a good faith belief to say that, but that's kind of just a defense, with all due respect to Professor Drew, that's a defense attorney just trying to across the board make a statement to influence the jury that will be sitting in a box in a couple of hours or a couple of months.

THE COURT: All right.

[PROSECUTOR]: But I agree with everything up to that.

THE COURT: Well, the "no involvement whatsoever" it seems to me is, you know, painting with a brush. The specifics are you said that he didn't plan it. He didn't participate in it. They didn't discuss it. And if the State is willing to stipulate that that would be the statement of this witness I think that's sufficient.

[DEFENSE COUNSEL]: And the idea was the juvenile's?

THE COURT: [The prosecutor] says that that's part of his stipulation, if I understood it right.

\* \* \*

Yes, but [defense counsel is] going beyond what's in the interview. [Defense counsel] is saying if I call him to testify he would say X. So, it's not just, he's not limiting it to what's in that interview.

\* \* \*

[PROSECUTOR]: **In the interview at one point [Jerquan] says, "I was the one who crawled through the screen. My cousin didn't do anything." I mean, that is the essence of the defense.** And he says in the interview, "My intention was just to look in the house."

And he talks about I, I, I. He basically in the interview he says these things.

"My cousin's boyfriend," you know, "my cousin [ (appellant) ] didn't do anything." So, I think that covers it when he says, "my cousin didn't do anything." To go beyond it and take that statement and say it five more times, you know, I am willing to stipulate . . . but I'm not willing to take that one statement and have it parsed into 10 different ways to say it.

**Those are pretty powerful words. [Jerquan] says, "I was the one who crawled through the screen. My cousin [ (appellant) ] didn't do anything."**

\* \* \*

[PROSECUTOR]: **Your Honor, I can go as far as to stipulate to everything he said, except to say that the juvenile would have said he wasn't involved in any way because the juvenile does say that they were together. They rang the doorbell together. They were present at the scene. So, I'm willing to go almost the whole distance,** but I just want some limiting thing so the door, open the door but some limiting thing so the jury won't hear that not only did, would this person have said he didn't do anything but that he wasn't involved and he wasn't present and there was no conversation. You know, the presence issue is very important.

When defense counsel refused to accept the State's stipulation and was unable to agree upon a trial date with the State within the *Hicks* rule, the Administrative Judge referred back to Maryland Rule 2–508(c). The court concluded that Jerquan was not "absent" under the rule and denied the continuance. Defense counsel then noted an objection followed by the court's response:

[DEFENSE COUNSEL]: For the record we are objecting. It would violate my client's 6th amendment right to a fair trial, to call witnesses, and to present a defense in this case; for what that's worth.

THE COURT: All right, I'll respectfully disagree. I think that [Jerquan] is not absent and **I think that the State is willing to stipulate to substantially everything that you wanted the witness to have said if he didn't assert the 5th [Amendment]** . . . .

(Emphasis added).

Based upon our review of the above transcript, defense counsel's proffer was insufficient to show that there was a material difference between Jerquan's potential live testimony and the content of Jerquan's recorded interview. The Administrative Judge observed that the State, which was relying on the content of Jerquan's recorded interview, was "willing to stipulate to substantially everything" in defense counsel's proffer. The State admitted that the recorded interview contained exculpatory statements with respect to appellant, which was "the essence of the defense."

There were apparently only two statements to which the State would not stipulate. First: "[T]he whole idea in breaking into this house was solely that of [Jerquan]." That statement, however, was essentially contained in Jerquan's interview, wherein Jerquan stated that "he's [appellant's] not really in this." Second: Appellant "had no involvement with it whatsoever." As the prosecutor correctly noted, that statement was contradicted by Jerquan's recorded interview. In the interview, Jerquan tells the detective that he and appellant were together at the scene of the crime—they were together on the deck in the back of the victim's house; they left together; they immediately encountered the police; and they ran. Because there was no material evidence in addition to, and not contradicted by, the evidence contained in the recorded interview, defense counsel failed to show how the case "could not be fairly tried" without the live testimony of Jerquan.[3]

---

**3.** There is no authority for the proposition that a defendant's constitutional right to a fair trial is violated where substantially similar testimony of a witness is admitted via audio or videotape instead of live in court. Moreover, to the extent that any proffered live testimony contra-

For the aforementioned reasons, appellant did not meet his burden to show all three *Jackson* criteria, and the trial court thus did not abuse its discretion in denying the appellant's motion for a continuance.

## II.

Appellant argues that the audiotape of Jerquan's interview, offered by the State in its case-in-chief, was inadmissible testimonial evidence under *Crawford*. Appellant claims that the audiotape was prejudicial to him in two ways: (1) the statements implied that appellant aided Jerquan in the burglary; and (2) the audiotape provided the prosecution with evidence that Jerquan intended to commit a theft. Although appellant concedes that he did not object to the admission of the audiotape, appellant maintains that he did not consent to its admission, because he "could only present [Jerquan's] exculpatory statements—which were the heart of his defense—by waiving his rights under *Crawford*."[4] Even if appellant did waive his right to contest the admission of the audiotape on appeal, appellant argues that the *Crawford* error was "sufficiently plain and sufficiently prejudicial to merit reversal on plain[ ]error review."

The State's response is two-fold: (1) appellant both consented to the introduction of the audiotape by the State and failed to object to its introduction, which constitutes a waiver of any error on appeal; and (2) even if the audiotape was admitted in error, the error was harmless beyond a reasonable doubt. The State disputes that appellant was forced to waive his Sixth Amendment rights, noting that the "substance of [appellant's] appellate complaint on this issue is not that the tape

---

dicts the witness' prior statement, such statement can be admitted as substantive evidence under Maryland Rule 5–802.1(a).

**4.** Appellant is apparently arguing that he was entitled to have the exculpatory portion of Jerquan's interview admitted into evidence, but at the same time have the incriminating statements in the interview excluded under *Crawford*. Appellant cites no authority for this proposition, nor have we found any.

was introduced, but that it was introduced by the State, and not by [appellant] himself." The State further argues that any error from playing the statement as part of the State's case-in-chief was harmless, because the statement would have been introduced by appellant "a few moments later."

■ Under Maryland Rule 4–323, "[a]n objection to the admission of evidence shall be made at the time the evidence is offered or as soon thereafter as the grounds for objection become apparent. *Otherwise, the objection is waived.*" (Emphasis added). Moreover, under Rule 8–131(a), an appellate court will not decide an issue unless it plainly appears to have been raised in or decided by the trial court. Thus, under Rules 4–323 and 8–131, unless the record reveals an objection by trial counsel to the admission of a particular piece of evidence, the issue is not preserved for appellate review. *See Acquah v. State,* 113 Md.App. 29, 43, 686 A.2d 690 (1996).

In the instant case, when the State introduced an audiotape of Jerquan's interview into evidence, defense counsel did not object to its admission:

[PROSECUTOR]: Detective Dufek, I'm showing you what's been marked as State's Exhibit 13. Could you tell me what that is?

[DETECTIVE]: It's a DVD copy of an interview that I conducted with Jerquan [ ].

[PROSECUTOR]: And when did you conduct that interview?

[DETECTIVE]: On December 29th of 2010.

[PROSECUTOR]: Okay, Your Honor, I'd like to move and play State's Exhibit 13 into evidence.

THE COURT: Any objection?

[DEFENSE COUNSEL]: **No objection.**

THE COURT: It's received.

(Emphasis added).

Furthermore, appellant consented to the admission of the audiotape. At the end of the first day of trial, the trial court asked what evidence the State would be presenting the next

day. The State indicated that it intended to introduce Jerquan's interview. After hearing a description of the interview, the trial court asked defense counsel if he wanted the entire interview to be played:

> THE COURT: So, the State wants the entire statement. How about you? We started this that you wanted at least a piece of it.

> [DEFENSE COUNSEL]: I, I—okay. **I'm accepting the statement being played, but I'm not giving up any rights that I had as a result of the continuance, when I wanted a live body here. So, yes, I want the entire statement in answer to your question.**

> THE COURT: **Does [the] State want to play the statement in it's case-in-chief?**

> [PROSECUTOR]: **Yes.**

> THE COURT: Okay. So, what else do I need to do? I mean, I can, I can let him invoke. He'll invoke. He'll be unavailable. I'll come in—

> [PROSECUTOR]: Under that rule [of evidence 5–804].

> THE COURT:—since **both sides want it. There's something in it for everybody, as I'm hearing it.**

(Emphasis added).

> The next day, the following colloquy occurred:

> THE COURT: What does the State have left, please?

> [PROSECUTOR]: Your Honor, we are going to play the 9–1–1 tape which is about two minutes.

*    *    *

> Four minutes, excuse me, four minutes. Then we're going to call on Detective Dufek. We're going to ask him a few questions. We're going to play the portions of the statements we've agreed to which are probably about 15 minutes each. One of Jerquan [ ] and one of the defendant.

*    *    *

THE COURT: **Okay, [defense counsel], what are you anticipating?**

[DEFENSE COUNSEL]: **I'm not anticipating doing anything else other than this statement that's played in the State's case in chief.**

(Emphasis added).

██ Because appellant failed to object and consented to the admission of the audiotape into evidence, appellant's argument on appeal that its admission violated his Sixth Amendment rights is unpreserved. *See* Md. Rules 4–323, 8–131(a); *Jefferson v. State,* 194 Md.App. 190, 200, 4 A.3d 17 (2010).

██ Moreover, even if appellant's objection had been preserved, any "error" from the admission of the interview was harmless. "Reversible error will be found and a new trial warranted *only* if the error was likely to have affected the verdict below.... If [the error] is merely harmless error, [then] the judgment will stand." *Conyers v. State,* 354 Md. 132, 160, 729 A.2d 910, *cert. denied,* 528 U.S. 910, 120 S.Ct. 258, 145 L.Ed.2d 216 (1999) (citations and quotations omitted) (alterations in original). Defense counsel indicated that it wanted the "entire statement" to be played and did not anticipate introducing any additional evidence in his case "other than this statement that's played in the State's case[-]in[-] chief." Furthermore, appellant's only stated reservation against the admission of the audiotape was to preserve any "rights that [he] had as a result of the continuance, when [he] wanted a live body here." Thus the admission of the audiotape during the State's case-in-chief was harmless error.

### III.

Finally, appellant argues that the evidence adduced at trial was insufficient to support his conviction for first degree burglary. Appellant asserts that there was no evidence of an agreement between appellant and Jerquan, and "mere physical presence is not, by itself, sufficient to prove guilt under an aiding and abetting theory." Furthermore, appellant contends that, by acquitting him of the conspiracy charge, "[t]he

jury necessarily determined that [appellant] did not enter into any agreement with [Jerquan] to assist him in the commission of a burglary," and that "the burglary was aborted long before any act of theft was attempted." Appellant concludes that the evidence cannot support a conviction for first degree burglary.

The State responds that "the fact that a jury acquitted [appellant] of conspiracy is irrelevant," and the issue is "whether there was sufficient evidence presented that would allow a reasonable finder of fact to conclude that [appellant] was guilty of burglary, beyond a reasonable doubt." Specifically, the State contends that the evidence adduced at trial "supported an inference that Jerquan and [appellant] had conspired to burglarize [the victim's] home, and that [appellant] at the very least assisted Jerquan when they first 'cased' and then broke into the home." The State also claims that appellant's flight from the home and Detwiler's testimony regarding the behavior of Jerquan and appellant "gave rise to the permissive inference that [appellant] ... was aware of what Jerquan was attempting and was assisting him in his endeavor."

We review a claim for insufficiency of the evidence to determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Smith v. State,* 415 Md. 174, 184, 999 A.2d 986 (2010) (citations and quotations omitted). Throughout this inquiry, "[w]e do not re-weigh the evidence, but we do determine whether the verdict was supported by sufficient evidence, direct or circumstantial," and "[a] valid conviction may be based solely on circumstantial evidence." *State v. Suddith,* 379 Md. 425, 430, 842 A.2d 716 (2004) (citations and quotations omitted). Finally, a "review of a claim of insufficiency is available only for the reasons given by appellant in his motion for judgment of acquittal." *Taylor v. State,* 175 Md.App. 153, 159, 926 A.2d 805 (2007) (citation and quotations omitted).

First degree burglary is defined as "break[ing] and enter[ing] the dwelling of another with the intent to commit

theft or a crime of violence." C.L. § 6–202(a). If the State proceeds under a theory of aiding and abetting, the State must present evidence that the alleged aider and abettor participated by "knowingly associating with the criminal venture with the intent to help commit the crime, being present when the crime is committed, and seeking, by some act, to make the crime succeed." *Maryland Criminal Pattern Jury Instructions* § 6:01.

At the close of the State's case-in-chief, appellant argued that there was no evidence that appellant aided or abetted Jerquan in the commission of the burglary. According to appellant, there was "absolutely no testimony that [appellant] did anything to either encourage [Jerquan], to lend support to [Jerquan], to in any way come within the definition of an aider and an abetter." Instead, appellant claimed that, "at best, he was present," but "[t]here has to be more than mere presence in this case."

We disagree and hold that the evidence was sufficient to support the conclusion that appellant aided and abetted Jerquan in the commission of first degree burglary. If believed by the jury, there was sufficient evidence that appellant (1) knowingly associated with Jerquan with the intent to help commit the burglary, (2) was present at the scene of the incident, and (3) acted to "make the crime succeed."

In her testimony at trial, Detwiler stated that she observed "two young black men" ring her front doorbell and walk to the back of her house, look through the lattice underneath her porch, go up on the deck, and look into two of her windows. Detwiler also saw one of the men attempt to push up on her dining room window unsuccessfully. Detwiler then saw one of the men stand on the deck while the other walked up to the porch door and pushed his hand through the screen. These two men then ran when confronted by Officer Kane and changed clothes before being arrested. The suspects were later identified as appellant and Jerquan.

Appellant's statements from his interrogation also supported an inference that appellant was involved in the burgla-

ry and was not merely present at the scene of the crime. Appellant stated that he and Jerquan did not know that anybody was home and that their "intentions [weren't] to hurt [anybody], and that Detwiler "didn't get hurt."

Finally, Jerquan's statements from his interview supported a finding of appellant's involvement in the burglary. Although Jerquan stated that appellant was "not really in this," Jerquan also used the word "we" multiple times in describing the incident:

> [DETECTIVE]: The police come to your house prior to you getting back, what happened, where were you all at?
>
> [JERQUAN]: We was at, standing outside getting a cigarette.
>
> \*     \*     \*
>
> [DETECTIVE]: So you guys were walking around. Who was the other guy?
>
> [JERQUAN]: **Me and, I mean he's not, you know what I mean, he's not really in this.**
>
> \*     \*     \*
>
> [JERQUAN]: Officer, look, **we did crawl through the screen.**
>
> [DETECTIVE]: Okay.
>
> [JERQUAN]: But **I didn't try to break in. I just looked, I just looked through the door honestly. I just looked in her back room and then we left because I said no, I'm not doing it.**
>
> \*     \*     \*
>
> [DETECTIVE]: Yeah, show me (unintelligible) the back porch, what happened there?
>
> [JERQUAN]: When I got in?
>
> [DETECTIVE]: Yeah.
>
> [JERQUAN]: I mean, **I just crawled through the door.** I didn't rip it open. It was already broken at the bottom.
>
> [DETECTIVE]: The screen was already broken?

[JERQUAN]: Yeah, the (unintelligible) so I just crawled through.

                 \*    \*    \*

[DETECTIVE]: When you got through into the inside of the screened-in part, then what happened?

[JERQUAN]: **I looked through the window like this and then I left.**

[DETECTIVE]: Okay.

[JERQUAN]: I said I'm not going.

[DETECTIVE]: Okay, and then that's when you encountered the police officers?

[JERQUAN]: **Yeah, that's when we walked down the steps.**

                 \*    \*    \*

**We just ran, even though we didn't do anything,** you know what I'm saying.

(Emphasis added).

If believed by the jury, the statements by Jerquan and appellant, as well as the testimony of Detwiler and Officers Kane and Veiga, were sufficient to support appellant's conviction for first degree burglary on a theory of aiding and abetting.

**JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY AFFIRMED; APPELLANT TO PAY COSTS.**