REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

CONSOLIDATED CASES

No. 2746
September Term, 2011

DIJON MCCLURKIN
v.
STATE OF MARYLAND

No. 2749
September Term, 2011

TAVON JACKSON
v.
STATE OF MARYLAND

Krauser, C.J.,
Kehoe,
Kenney, James A., III
 (Retired, Specially Assigned),

JJ.

Opinion by Krauser, C.J.

Filed: April 1, 2015

Tavon Jackson and Dijon McClurkin, appellants, were tried together, by a jury in the Circuit Court for Baltimore City, for the attempted first-degree murder of Reginald Devon Maynard (whom we shall hereafter refer to as "the victim") as well as for the offenses they perpetrated in committing that crime, which included the separate offense of assault upon the victim's mother.[1] At their joint trial, recordings of telephone calls made by the then-incarcerated appellants, in which they sought to have others pressure the victim into recanting his identification of them as his assailants, were played for the jury. After they were convicted and sentenced for attempted first-degree murder and multiple attendant crimes, appellants noted separate appeals, which we subsequently consolidated, as they raise a common issue and that is:

> I. Whether appellants' rights of confrontation under the Sixth Amendment were violated when the circuit court admitted into evidence, at their joint trial, recordings of telephone calls made by both appellants from jail.

McClurkin separately raises the following issue:

> II. Whether the circuit court erred in admitting into evidence a recording of a telephone call made by McClurkin's co-defendant, Jackson, as that call, according to McClurkin, constituted inadmissible hearsay.

---

[1]Those other crimes, all of which were directed at the same victim, Devon Maynard, included attempted second-degree murder; first-degree assault; second-degree assault; use of a handgun in the commission of a felony or crime of violence; wearing, carrying, or transporting a handgun on his person; wearing, carrying, or transporting a handgun in a vehicle; and reckless endangerment. Appellants were further charged with and tried for conspiracy to murder, as well as conspiracy to assault and to commit the handgun offenses, and McClurkin was charged with assaulting the victim's mother, Katrina Dorsey, as well as offenses related to that separate assault.

And Jackson presents three issues of his own. They are:

III.    Whether the evidence was sufficient to convict him.

IV.    Whether the circuit court erred in failing to merge his conviction and sentence for reckless endangerment into his conviction and sentence for attempted first-degree murder.

V.    Whether the circuit court erred in sentencing him for three separate conspiracies.

Because the telephone calls were not of a testimonial nature, we hold that their introduction at trial did not violate the Confrontation Clause. We further hold that, although Jackson's call was properly admitted against him as a statement of a party-opponent, it was inadmissible against McClurkin, but that erroneous admission amounted to no more than harmless error. Hence, we shall affirm all of McClurkin's judgments of conviction.

We reach, however, a different result as to Jackson: Although there was sufficient evidence to sustain Jackson's convictions for attempted first-degree murder, use of a handgun in the commission of a crime of violence, reckless endangerment, and illegal possession of a firearm, there was no evidence that he engaged in three separate conspiracies in the commission of those crimes. Consequently, the circuit court did err in sentencing him on more than one conspiracy count, and, because we also find that the court below erred in failing to merge Jackson's conviction of reckless endangerment into his conviction of attempted first-degree murder, we shall not only reverse two of Jackson's three convictions for conspiracy and vacate their corresponding sentences (leaving intact his conviction and

2

sentence for conspiracy to murder) but also vacate his sentence for reckless endangerment as well.

## The Shooting[2]

The victim, Devon Maynard, on the date of the shooting in question, not only lived on the same block as Tavon Jackson, but the two men were once friends. That amicable relationship ended, about a year before the shooting, when they had a falling out over Jackson's failure to repay a $200 loan he had received from the victim. Eventually, their monetary dispute led to a "fistfight" between the two men that ended when the victim, in his words, "got the best of" Jackson. Although they shook hands after the fight was over, Jackson would, in the months that followed, "taunt" the victim, pick fights with him, and "bump" into him "once or twice a week." And, on one noteworthy occasion, Jackson, accompanied by his future co-defendant, McClurkin, tried to start a fight with the victim in an alleyway.

On the night of the shooting, the victim spent the evening at the house of a friend, Antwon Weston, who lived on the same street as the victim and Jackson. Jackson lived in a house that was between the homes of the victim and Weston. While walking home that night, the victim noticed, as he passed by Jackson's house, that Jackson was "peeking out his door" at him. After arriving home and having something to eat, the victim told his mother,

---

[2]We are required to review the evidence presented at trial in a light most favorable to the prevailing party—in this instance, the State. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

Katrina Dorsey, that he was going to return to Weston's house and that he wanted her to watch him as he walked up the street, despairing that he would have to pass by Jackson's house to reach Weston's residence. His mother agreed, and, from the sidewalk in front of her house, she watched as he tread up the street toward Weston's house.

As the victim began his perambulation, he observed Jackson standing outside his house and saw a maroon sport utility vehicle ("SUV") double parked in front of Jackson's house. That vehicle was occupied by McClurkin and another individual (later identified as "Donte Anderson"). When the victim drew near, McClurkin got out of the SUV, whereupon Jackson said something to McClurkin, who then reached into the back seat of the SUV. Once the victim had walked past Jackson, McClurkin, and the maroon SUV, Jackson began to follow the victim at a "slow pace," while McClurkin, seemingly in tandem, walked quickly up the street, in what appeared to be an attempt to get ahead of the victim. As the victim turned around to see what Jackson was up to, McClurkin approached and called out his name. When the two men were "face to face," McClurkin shot the victim.

Wounded, the victim began to run from the scene. While he was in flight, McClurkin fired several more times at him, wounding the victim once more. The victim then fell but was soon able to pick himself up and continue his flight, crossing the street and then a park, before ending up in an adjacent street, where he saw a police car. To draw attention to himself, the victim threw his cell phone at that vehicle. The patrol car then stopped, and the officer got out and rendered assistance to the victim.

4

Meanwhile, the victim's mother, Katrina Dorsey, having observed the shooting, ran up the street toward McClurkin "screaming and shouting." At that point, McClurkin pointed the gun at Dorsey, whereupon Jackson instructed McClurkin (whose nickname was "Man Man"), "No, Man, no." In compliance with that command, McClurkin declined to take any further action. He and Jackson then left the area, and Dorsey began to look for her son.

After a few minutes had passed, a neighbor, upon hearing dogs barking behind her house, looked out the window and saw two men using a cell phone, while "looking back and forth" suspiciously. A few moments later, that same neighbor saw a maroon SUV drive up the alley with its headlights off. She then observed the vehicle stop, pick up the two men, and drive away.

Within minutes, officers in a police helicopter, who were responding to reports of a shooting, observed the same maroon SUV drive down the alley without its headlights on and relayed that information to officers on the ground. A police cruiser then pulled up behind the SUV and activated its lights, whereupon the SUV stopped, and three men "bailed out." Minutes later, all three were apprehended.

Forty days after the shooting, the now-hospitalized victim identified, for police, "Man Man," that is, McClurkin, whom he had known for "a couple of years," as the person who had shot him; Jackson, with whom he had once been good friends, as the other individual who had participated in the shooting; and Anderson, whom he did not know, as the driver of the SUV. At that time, detectives presented the victim with three separate photographic

5

arrays, and he selected McClurkin from the first array, Jackson from the second, and Anderson from the third.

## The Telephone Calls at Issue

Five days after the shooting, while incarcerated in the Baltimore City Detention Center, Jackson and McClurkin made separate telephone calls to unidentified women. In accordance with correctional policy and procedures, those calls were recorded, and, before any recordation began, an auditory notice was given to anyone on the line that the call would be recorded. During one of those calls, Jackson told the woman, with whom he was speaking, that he needed someone to pressure the victim and to stop him from telling people that he and McClurkin were involved in the shooting. McClurkin gave similar instructions to the person he called that day.

Two days later, McClurkin made two more telephone calls from the detention center, to another individual, hoping to enlist that person in an effort to induce the victim to sign a "paper," which stated that McClurkin, Jackson, and Anderson had nothing to do with the shooting. During a second call to the same person later that day, McClurkin said that the "paper," which he now identified as a "letter," from the victim, would be a "help." Otherwise, he warned that he and Jackson would be doomed to spend their lives in jail.

6

## Trial and Sentencing

During the joint trial of Jackson and McClurkin,[3] the State offered, among other witnesses, the testimony of the victim and his mother, Katrina Dorsey. Then, over the objections of appellants, the State played, for the jury, the recordings of the four telephone calls—one made by Jackson, the other three by McClurkin—while the two men were incarcerated and awaiting trial. Neither appellant ever took the stand nor presented any evidence.

At the conclusion of appellants' joint trial, the jury found Jackson guilty of attempted first-degree murder; using a handgun in the commission of a crime of violence; reckless endangerment; conspiracy to commit first-degree murder; conspiracy to use a handgun in the commission of a crime of violence; conspiracy to wear, carry, or transport a handgun on his person; and unlawful possession of a firearm. He was sentenced to life imprisonment for attempted first-degree murder, with all but seventy years suspended; to a consecutive term of five years' imprisonment, without the possibility of parole, for using a handgun in the commission of a crime of violence; to concurrent five-year terms for reckless endangerment, conspiracy to use a handgun in the commission of a crime of violence, conspiracy to wear, carry, or transport a handgun on his person, and unlawful possession of a firearm; and a concurrent ten-year term for conspiracy to murder, to be followed by three years of probation.

---

[3]Anderson's case was severed from that of appellants. He later pleaded guilty to assault in the first degree, conspiracy to commit assault in the first degree, and unlawful possession of a firearm.

7

Of particular relevance to this appeal, Jackson received a separate sentence for reckless endangerment as well as three separate sentences for conspiracy.

The jury then found McClurkin, Jackson's co-defendant, guilty of attempted first-degree murder; wearing, carrying, or transporting a handgun on his person; reckless endangerment; conspiracy to commit first-degree murder; conspiracy to use a handgun in the commission of a crime of violence; conspiracy to wear, carry, or transport a handgun on his person; and two counts of using a handgun in the commission of a crime of violence; as well as second-degree assault of Katrina Dorsey, the victim's mother. McClurkin was sentenced, for the crimes committed against the principal victim, as follows: life imprisonment for attempted first-degree murder, with all but fifty years suspended; a consecutive term of five years' imprisonment, without the possibility of parole, for using a handgun in the commission of a crime of violence; concurrent five-year terms for reckless endangerment, conspiracy to use a handgun in the commission of a crime of violence, and conspiracy to wear, carry, or transport a handgun on his person; and a concurrent ten-year term for conspiracy to murder. For the crimes committed against Dorsey, McClurkin was sentenced to five years' imprisonment for second-degree assault, consecutive to the sentences previously imposed, as well as five years' imprisonment, without the possibility of parole, for the second count of use a handgun in the commission of a crime of violence, concurrent with the sentence imposed for second-degree assault, all of which was to be followed by three years of

probation. Following sentencing, Jackson and McClurkin noted separate appeals, which we thereafter consolidated for appellate review.

## Discussion

### I.

Jackson and McClurkin contend that the circuit court erred in ruling that the State could play, for the jury, recordings of jailhouse telephone calls made by appellants, given that neither appellant took the stand during trial and thus both were denied the opportunity to cross-examine the other about the statements he made during those telephone conversations. That ruling, appellants claim, violated their respective rights of confrontation under the Sixth Amendment.

In *Bruton v. United States*, 391 U.S. 123 (1968), the Supreme Court held that the right of confrontation is violated by the introduction, at a joint trial of co-defendants, of an out-of-court confession made by a non-testifying co-defendant, implicating another co-defendant. But, for there to be what has become known as a "*Bruton* violation," the statement at issue must qualify as "testimonial" hearsay, *State v. Payne and Bond*, 440 Md. 680, 716-18 (2014), a standard confected by the Supreme Court in *Crawford v. Washington*, 541 U.S. 36, 68 (2004). In that landmark case, the Supreme Court held that the Confrontation Clause prohibits the admission, at trial, of "testimonial" hearsay of a non-testifying declarant unless he was "unavailable" to testify and the defendant had a prior opportunity to cross-examine him.

9

As for non-testimonial hearsay, the *Crawford* Court opined that it does not fall within the sweep of the Confrontation Clause, observing that, "[w]here non[-]testimonial hearsay is at issue, it is wholly consistent with the Framers' design to afford the States flexibility in their development of hearsay law[.]" *Id.* at 68. Subsequently, in *Whorton v. Bockting*, 549 U.S. 406, 420 (2007), the Court made clear that, "[u]nder *Crawford*, . . . the Confrontation Clause has no application to [non-testimonial] statements." Therefore, we must determine whether the statements admitted at the trial of Jackson and McClurkin—that is, the recordings of the telephone calls they placed from jail—were of a "testimonial" nature and thus within the purview of the Confrontation Clause.

Two decisions of the Court of Appeals, although not directly on point, provide helpful guidance in this matter, as they address whether statements made, under circumstances that are, in many respects, comparable to those presented here, are "testimonial": *Cox v. State*, 421 Md. 630 (2011), and *State v. Payne and Bond*, 440 Md. 680 (2014).

In *Cox v. State*, Ronald Cox and a Rodney Johnson were arrested and charged with first-degree murder and related offenses. *Cox*, 421 Md. at 638, 641. While they were incarcerated and awaiting trial, they spoke with a fellow inmate and long-time acquaintance of Johnson's, Michael West. *Id.* at 639. During that conversation, Johnson told West "about the murder and the subsequent arrest in detail, without provocation, while [Cox] stood close by, listening and occasionally filling in details." *Id.* At Cox's ensuing trial, over the defense's objection, West was permitted to testify about that jailhouse conversation, thereby

10

providing the jury with Johnson's out-of-court statements. Cox was subsequently convicted on all counts. *Id.* at 641.

When the question of the admissibility, under the Confrontation Clause, of Johnson's jailhouse statements to West was raised before the Court of Appeals, our highest Court prefaced its answer to that question by stating the test for determining whether an out-of-court statement is "testimonial" is "whether a reasonable person in the declarant's situation would have made the statement 'with a primary purpose of creating an out-of-court substitute for trial testimony.'" *Id.* at 650 (quoting *Michigan v. Bryant*, 562 U.S. \_\_\_, \_\_\_, 131 S. Ct. 1143, 1155 (2011)).  Then, turning to the facts presented by that case, the Court observed that West "was not acting as a law enforcement agent; rather, the interaction [with Johnson and Cox] was a casual conversation between private acquaintances." *Id.*  It went on to further observe that it was "unlikely" that Johnson would have made the statements to West "if he believed the statements would be used in a later trial"; rather, Johnson's statements, the Court noted, were "much more akin to casual remarks to an acquaintance than formal declarations to an official." *Id.* (citation and quotation omitted).  Then, applying the test it had earlier articulated, the Court of Appeals found that, given that Johnson "did not intend to bear testimony against Cox" or "to establish facts for use in a criminal investigation or prosecution," his "casual statements" to West were "not made for the primary purpose of creating a substitute for trial testimony" and were therefore not "testimonial." *Id.* at 650-51 (citation and quotation omitted).

11

If a "casual conversation" between inmates is not testimonial, neither is the type of conversation that occurs during a telephone call between an inmate and a friend, as occurred here. Moreover, as in *Cox*, neither appellant wished his telephone statements "to establish facts for use in a criminal investigation or prosecution." *Id.* at 650 (citation and quotation omitted). Therefore, *Cox* suggests that we conclude that the telephone calls at issue in the instant case were non-testimonial.

The second of the two Maryland cases which have a bearing on the issue before us is the very recent decision of the Court of Appeals in *State v. Payne and Bond*, 440 Md. 680 (2014). At appellants' joint trial for first-degree felony murder and related charges, the State introduced, against both defendants, six recorded telephone conversations, lawfully obtained via a wiretap, "in which Bond was a participant but Payne was not, in which the discussions suggested an alibi on the night of the murder." *Id.* at 683. Following their convictions for first-degree felony murder, kidnapping, and use of a handgun in the commission of a felony, the Court of Appeals was ultimately asked to decide whether "the six recordings were non-testimonial and, therefore, could be played during a joint trial of Payne and Bond," as "evidence only against Bond," without violating Payne's confrontation rights. *Id.* at 714.

The Court of Appeals, relying upon *Cox*, declared that those recordings were of a non-testimonial nature, as they "were 'more akin to casual remarks to an acquaintance than formal declarations to an official.'" *Payne and Bond*, 440 Md. at 716 (quoting *Cox*, 421 Md. at 650). And, "because the six wiretapped recordings" were "non-testimonial," their

12

admission in a joint trial did "not implicate Payne's Confrontation Clause rights." *Id.* at 717-18. The statements made by each of the appellants, during their respective jailhouse telephone calls, were also clearly "more akin to casual remarks to an acquaintance than formal declarations to an official." *Id.* at 716 (quoting *Cox*, 421 Md. at 650).

Finally, while admittedly neither *Cox* nor *Payne and Bond* addressed the precise question that now confronts us, namely, whether jailhouse telephone calls are "testimonial" under *Crawford* and its progeny, the United States Court of Appeals for the Fourth Circuit has addressed that question recently, in *United States v. Jones*, 716 F.3d 851 (4th Cir.), *cert. denied*, 134 S. Ct. 496 (2013).

Jones, while serving in the United States Navy, masterminded a conspiracy to arrange, for a fee, fraudulent marriages between several of his shipmates and foreign nationals. *Id.* at 854. One of those sailors who entered into a fraudulent marriage, Jones's cousin Otis, was subsequently incarcerated (for reasons not indicated in the opinion). *Id.* While incarcerated, Otis placed several telephone calls to Jones and another co-conspirator, Austin. As in the instant case, each of those calls was recorded, and a notice was given before each call was connected "that 'all calls are subject to recording.'" *Id.* at 855. At Jones's trial, the prosecution introduced those recorded telephone calls, over defense objection.

After he was convicted of multiple offenses, Jones appealed, contending that the admission of statements made by Otis and Austin, during the jailhouse telephone calls, violated his right of confrontation. He pointed out that he had been given no "opportunity

13

to cross-examine the declarants before or at trial" and that the declarants' awareness that they were being recorded rendered their statements "testimonial." *Id.* at 856.

The federal appellate court began its analysis of that issue by articulating the test for determining whether a statement is "testimonial," a test comparable to the one articulated in *Cox*:

> [S]tatements are testimonial when a reasonable person in the declarant's position would have expected his statements to be used at trial—that is, [when] the declarant would have expected or intended to "bear witness" against another in a later proceeding.

*Id.* (citation and quotation omitted).

Then, in applying that test, the Fourth Circuit rejected Jones's assertion that a declarant's knowledge that he is being recorded renders his statement "testimonial," avowing that "just because recorded statements are used at trial does not mean they were created for trial." *Id.* at 856 (citation and quotation omitted). Indeed, "Otis and Austin," observed the court, "certainly did not speak on these phone calls for that reason." *Id.* Rather, the recorded telephone calls were "casual conversations," which "primarily concerned Otis's emotional state and the prison conditions." *Id.* In fact, "[n]owhere" in the recorded conversations, observed the Fourth Circuit, did "either Otis or Austin demonstrate an intent to 'bear witness' against Jones," an observation which it later bolstered by noting that "any incriminating statement made during these conversations tended to also incriminate them in the fraudulent scheme." *Id.*

14

The Fourth Circuit further noted that "a prison has a significant institutional reason for recording phone calls outside of procuring forensic evidence," specifically, the need to ensure its security, and that to adopt the rule Jones proposed, the federal court noted, would have required it "to conclude that all parties to a jailhouse phone call categorically intend to bear witness against the person their statements may ultimately incriminate." *Id.* Such a categorical rule, it observed, ignores the fact that "a declarant's understanding that a statement could potentially serve as criminal evidence does not necessarily denote 'testimonial' intent," as well as the "context[]" in which any hearsay must be analyzed for confrontation purposes. *Id.* The Fourth Circuit therefore rejected this rule, a rule championed by Jones, which, we observe, is precisely the same as that advanced by appellants.

Applying the reasoning of *Cox*, *Payne and Bond*, and *Jones*, we conclude that the statements at issue in the instant case—the recorded jailhouse calls by Jackson and McClurkin—were non-testimonial, because a reasonable person in the declarant's position would not have made the statement "with a primary purpose of creating an out-of-court substitute for trial testimony." *Cox*, 421 Md. at 650 (quoting *Bryant*, 562 U.S. at ___ ,131 S. Ct. at 1155).

In their respective calls, Jackson and McClurkin instructed the recipients of the calls that the victim needed to be pressured into stating that neither one of them was involved in the shooting. As the primary purpose of those calls was clearly to induce the victim to

15

change his account of who was involved in the shooting, it hardly needs stating that no reasonable person would have made such calls with a purpose, "primary" or otherwise, that they be used as evidence, at his or her future trial, given their inculpatory nature. *See Jones*, 716 F.3d at 856 (observing that "any incriminating statement made during these conversations tended to also incriminate" the declarants themselves, belying any purported "testimonial" purpose); *Payne and Bond*, 440 Md. at 716 (stating that "surreptitiously monitored private conversations and statements contained in wiretap recordings are not testimonial" because "the speakers certainly did not make the statements thinking that they would be available for use at a later trial") (citations and quotations omitted). Indeed, like the out-of-court statements in *Cox*, 421 Md. at 650, and the wiretapped telephone calls in *Payne and Bond*, 440 Md. at 716, the calls at issue here were "casual conversations between private acquaintances," a conclusion which other appellate courts, facing the same issue under similar sets of circumstances, have drawn. *Jones*, 716 F.3d at 856 (characterizing recorded jailhouse telephone calls as "casual conversations"); *United States v. Castro-Davis*, 612 F.3d 53 (1st Cir. 2010) (and cases cited therein) (holding that a jailhouse telephone call was not testimonial hearsay), *cert. denied*, 131 S. Ct. 970 (2011).

We further note that, were we to adopt the rule advocated by appellants in this case, we would be forced to conclude, merely because correctional institutions record outgoing telephone calls and routinely notify the participants that their conversations are being recorded, "that all parties to a jailhouse phone call categorically intend to bear witness

16

against the person their statements may ultimately incriminate." *Jones*, 716 F.3d at 856.

Such a categorical rule defies logic and its more pedestrian partner, common sense, and is, moreover, inconsistent with the "contextual inquiry" that is required in assessing whether a statement is "testimonial." *Id.*

Since the calls made by Jackson and McClurkin were not testimonial, the Confrontation Clause did not prohibit the admission of the recordings of those calls at their joint trial. But that does not end our discussion of the admissibility of the recordings at issue, as McClurkin also challenges the admission of Jackson's call on evidentiary grounds, specifically, that Jackson's call constituted inadmissable hearsay.

## II.

McClurkin contends that the call made by Jackson while he was in jail, during which he instructed the person whom he called to get someone to "holler" at and "put the pressure" on the victim to change his story, was inadmissible hearsay.[4] That potentially inculpatory instruction, according to McClurkin, was not a statement made by a co-conspirator during the course and in furtherance of a conspiracy because the conspiracy in question, that is, the conspiracy to harm the victim, had ended by the time Jackson and McClurkin were arrested and incarcerated. Nor should that telephone directive have been admitted as a statement

---

[4]Jackson, unlike McClurkin, does not raise a hearsay challenge to the admission into evidence of McClurkin's jailhouse telephone calls; Jackson's only claim of error regarding those telephone calls was based upon Sixth Amendment grounds and is addressed in Part I, *supra*.

17

against penal interest, claims McClurkin, as the circuit court failed to consider whether Jackson had a motive to falsify the statement.[5]

The State responds that the statement was not hearsay, because it was a "verbal act" evincing Jackson's "consciousness of guilt"; and that, even if it were hearsay, it was admissible as a statement by a party-opponent or as a statement by a co-conspirator. Moreover, even if erroneously admitted, that error was harmless, claims the State.

### *Hearsay and "Implied Assertions"*

Our discussion begins with the question of whether Jackson's jailhouse telephone instruction was hearsay. Maryland Rule 5-801(c) defines "hearsay" as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." And Maryland Rule 5-801(a) defines a "statement" as "(1) an oral or written assertion or (2) nonverbal conduct of a person, if it is intended by the person as an assertion."

But, what constitutes an "assertion" is not defined in the rule, as the Committee note to Rule 5-801 points out. Rather, that definition is left "to development in the case law." In

---

[5] Although McClurkin moved for severance below, and the circuit court denied that motion, he does not raise that issue on appeal. He merely mentions severance at the conclusion of his brief, in what amounts to a single passing remark, without argument or citation of authority. *See* Md. Rule 8-504(a)(6) (providing that brief must contain "[a]rgument in support of the party's position on each issue"). We therefore decline to address that issue. *Abbott v. State*, 190 Md. App. 595, 631-32 n.14 (2010) (declining to consider issue that was included in the questions presented but was otherwise not addressed in Abbott's brief).

18

determining what is an "assertion," for purposes of the foregoing Maryland rule, we look not only to "the declaration's literal contents," but also, in the words of the leading Maryland case on this subject—*Stoddard v. State*, 389 Md. 681 (2005)—to "the implications or inferences contained within or drawn from an utterance." *Id.* at 689-90. An exposition of the *Stoddard* decision would now prove helpful, we believe, in defining this concept.

Erik Stoddard was convicted of second-degree murder and child abuse resulting in the death of Calen, a three-year-old child, who had died as the result of "multiple blunt force injuries." *Id.* at 683. Calen's two-year-old cousin, Jasmine, had been with her, Stoddard, and another child when the fatal injuries occurred. The statement at issue in that case was Jasmine's question to her mother, after Calen's death. She asked, "if Erik was going to get her." *Id.* at 685. That query was disclosed by Jasmine's mother during Stoddard's trial. *Id.*

On appeal, Stoddard claimed that Jasmine's statement was hearsay and should not have been admitted into evidence, as it was offered for the truth of the implied assertion "that Jasmine was afraid of Stoddard *because she had seen Stoddard assault Calen.*" *Id.* at 688. Agreeing with that position, the Court of Appeals adopted a broad interpretation of "implied assertions," which, in effect, rejected the view of many other courts "that a person's conduct, whether verbal or non-verbal, will not constitute a statement for purposes of the hearsay rule unless the person intended his or her conduct to assert the matter sought to be admitted for its truth." *Id.* at 729 (Wilner, J., concurring). The Court avowed that "a declarant's lack of intent to communicate a belief in the truth of a particular proposition is irrelevant to the

19

determination of whether the words are hearsay when offered to prove the truth of that proposition," as "out-of-court words offered for the truth of unintentional implications are not different substantially from out-of-court words offered for the truth of intentional communications." *Id.* at 703.

In reaching that conclusion, the Court of Appeals examined cases from other jurisdictions. In particular, it relied upon *Lyle v. Koehler*, 720 F.2d 426 (6th Cir. 1983), a case that involved a fact pattern similar to the one presented by the instant case, as it involved communications from Lyle's incarcerated co-defendant, Kemp, to potential witnesses, in which he "attempt[ed] to establish an alibi." *Id.* at 429. In *Lyle*, four men broke into a home, took jewelry, and shot three residents; two of whom died. Roger Lyle and Nathaniel Kemp were thereafter arrested and tried together in the Circuit Court for the County of Saginaw, Michigan. At that trial, two letters written by the incarcerated Kemp to two potential witnesses were admitted into evidence. In those letters, Kemp said that he was being framed and then gave detailed instructions as to what the recipient was to tell the police had happened on the night of the break-in, thereby providing himself with an alibi. *Id.*

After being convicted and exhausting his state post-conviction remedies, Lyle petitioned for a writ of habeas corpus in the United States District Court for the Eastern District of Michigan. When that petition was denied, he noted an appeal. *Id.* at 427. Thereafter, in the United States Court of Appeals for the Sixth Circuit, Lyle claimed, among other things, that admission of the two letters written by his co-defendant, Kemp, violated

20

his right of confrontation, because those letters contained the hearsay statements of a co-defendant who did not testify and therefore could not be cross-examined. The Sixth Circuit agreed.

It began its analysis with the observation that the prosecution, "[b]elieving the alibi to be false," "obviously did not seek to introduce the letters in order to demonstrate the truth of the particular statements they contained." *Id.* at 432. Rather, it was the prosecution's intention, stated that federal appellate court, "to have the jury infer from the statements that Kemp was attempting to obtain fabricated alibi testimony, an act that revealed a 'guilty mind' on his part regarding the shootings." *Id.* And that "guilty mind" inference, the court noted, "invited the jury to infer Kemp's substantive guilt." *Id.* The Sixth Circuit therefore concluded that the letters were hearsay and that, since Kemp was unavailable for cross-examination, Lyle's right of confrontation was violated by their introduction at his and Kemp's joint trial.[6]

Applying the reasoning in *Lyle* to the facts of the instant case leads us to a similar conclusion: The State did not introduce the recording of the telephone call made by Jackson to prove the only direct assertion it contained—that Jackson had not been responsible for shooting the victim—but to encourage the jury to infer from the call that Jackson, and by implication McClurkin, were urging others to intimidate the victim into changing his story

---

[6]Because *Lyle* was decided under the pre-*Crawford* Confrontation Clause regime, the Sixth Circuit did not need to determine whether the letters were "testimonial" before it found a violation of Lyle's right of confrontation.

so that it no longer implicated them in the shooting at issue; that they were doing so because they had "guilty minds"; and that, therefore, they were guilty of the charges against them.[7] That this was the State's objective was confirmed by the State when, during closing argument, it urged the jury to conclude that the content of the calls made by both Jackson and McClurkin demonstrated a "consciousness of guilt" because they were not "calls that innocent people make." And Jackson's statement was hearsay when used for that purpose.

### *Party-opponent Hearsay Exception*

That, of course, does not conclude our discussion of whether the statement at issue was "admissible," because, under certain circumstances, hearsay is admissible, under an exception to the rule against hearsay, and one of those exceptions is a statement by a party-opponent under Maryland Rule 5-803(a)(1). That rule provides:

> The following are not excluded by the hearsay rule, even though the declarant is available as a witness:
>
> (a) Statement by a party-opponent. A statement that is offered against a party and is:
>
> (1) The party's own statement, in either an individual or representative capacity; . . .

To qualify for admission into evidence under this rule, the statement must have been "made, adopted, or authorized by a party or that party's agent or coconspirator"; it must be

---

[7]Under *Stoddard v. State*, 389 Md. 681 (2005), it was "irrelevant" whether Jackson intended to "communicate a belief in the truth of" any of these implied, inculpatory assertions. *Id.* at 703.

"offered in evidence against that party by an opposing party (it is not offered by the party who made the statement)"; and, "as with all evidence, the statement must be relevant to a material fact." 6A Lynn McLain, *Maryland Evidence*, § 801(4):1, at 333-34 (3d ed. 2013). Jackson's jailhouse call met all of those requirements, at least as to Jackson: It was a statement made by Jackson, which was offered by the State, and was relevant to prove that Jackson was guilty of the crimes charged.

As for McClurkin, however, the statement Jackson made was inadmissible, as a statement of a party-opponent, for the simple reason that, under materially indistinguishable circumstances, the Court of Appeals recently held that a co-defendant's hearsay statements were inadmissible, under the party-opponent exception, against the other defendant in a joint criminal trial. *State v. Payne and Bond*, *supra*, 440 Md. at 710 (holding that, in a joint criminal trial, neither defendant is a party-opponent of the other and that, therefore, hearsay statements by a co-defendant in wiretapped recordings were not admissible against the other defendant).

### *Co-conspirator Hearsay Exception*

We also do not agree with the State's contention that Jackson's statement, in the jailhouse telephone call, was admissible against McClurkin as a statement made in furtherance of a conspiracy, an exception to the rule against hearsay. In *State v. Rivenbark*, 311 Md. 147 (1987), the Court of Appeals "reject[ed] the theory that every criminal conspiracy includes, by implication, a subsidiary conspiracy to conceal evidence of the

23

substantive offense that the conspirators agreed to commit." *Id.* at 158. It therefore held, in that case, that "a co-conspirator's statement is inadmissible unless it was made before the attainment of the conspiracy's central objective." *Id.*

The State nonetheless claims that, as the objective of the conspiracy was to kill the victim and that that objective had not yet been attained, Jackson's statement fell within the co-conspirator hearsay exception. But his statement was made, not as part of a conspiracy to kill the victim, but as part of an attempt to conceal evidence. And it was made, moreover, long after the criminal acts, which Jackson and McClurkin had conspired to commit, were performed, if even they did not achieve their goal. Thus, Jackson's jailhouse telephone call was inadmissible against McClurkin under the co-conspirator hearsay exception.

### *Harmless Error*

In any event, though the circuit court erred in admitting the recording of the call made by Jackson because it was inadmissible hearsay as to McClurkin, that error was harmless beyond a reasonable doubt. The "overall strength" of the State's case against McClurkin weighs heavily in favor of a finding of harmless error. *See Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986) (observing that among the factors to be considered in a harmless error analysis is "the overall strength of the prosecution's case"). McClurkin was well known to the victim before the shooting and had participated in at least one incident, together with Jackson, in which the two men had tried to start a fight with the victim. Thus, the victim had no trouble identifying McClurkin as the person who had shot him. Moreover, the police

24

arrested McClurkin and his co-conspirators shortly after the shooting, as they attempted to flee in the maroon SUV that police were pursuing.

Furthermore, the recording of Jackson's telephone call was no more than cumulative evidence, as three calls made from jail by McClurkin were admitted into evidence, and, in each of those calls, McClurkin requested that someone pressure the victim into changing his story. Indeed, McClurkin's calls were more damaging than Jackson's, because he expressly named Jackson and Anderson, thereby implying that he was one of the three men who conspired to shoot the victim. In contrast, Jackson, in his call, referred only by implication to McClurkin when he instructed, "You need to tell him that **we** ain't do nothing . . . ." (Emphasis added.)

Although, as McClurkin observes, the jury asked to be provided with a "radio" to permit playback of the audio recordings of the jailhouse telephone calls, a request to which the court agreed, that observation, standing alone, does not affect our harmless error analysis. Given that the victim was shot; that the victim identified McClurkin as the shooter; that McClurkin was the same person who, moments later, pointed a gun at Dorsey; that McClurkin was apprehended, with his co-conspirators, Jackson and Anderson, almost immediately after the shooting, while in the act of fleeing the crime scene; and that the recording of Jackson's telephone call was only cumulative to McClurkin's own properly admitted and far more damning hearsay statements, it is clear that the admission of Jackson's call was "unimportant in relation to everything else the jury considered in reaching its

25

verdict" and therefore harmless beyond a reasonable doubt. *Dionas v. State*, 436 Md. 97, 118 (2013).

## III.

Jackson contends that the evidence produced by the State was insufficient to support a finding that he was aiding and abetting or conspiring with McClurkin when McClurkin shot the victim. The evidence did not show, he claims, that he was anything more than a bystander to the shooting.

The standard we apply, in reviewing the sufficiency of the evidence, is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original); *accord Allen v. State*, 402 Md. 59, 71 (2007). In applying that standard, we give "due regard to the [fact-finder's] findings of facts, its resolution of conflicting evidence, and, significantly, its opportunity to observe and assess the credibility of witnesses." *Harrison v. State*, 382 Md. 477, 488 (2004) (and cases cited therein).

To prove that an accused aided and abetted another in committing a crime, "the State must present evidence that the alleged aider and abettor participated by 'knowingly associating with the criminal venture with the intent to help commit the crime, being present when the crime is committed, and seeking, by some act, to make the crime succeed.'" *Davis v. State*, 207 Md. App. 298, 319 (2012) (quoting *Maryland Criminal Pattern Jury*

26

*Instructions* § 6:01 ("MPJI-Cr")). On the other hand, to prove a criminal conspiracy, the State must establish that the alleged conspirator "agreed with at least one other person to commit" the crime that was the object of the conspiracy and that he "entered into the agreement with the intent" that that criminal objective be achieved. MPJI-Cr 4:08. Its "essence" is "an unlawful agreement," and it "may be shown by 'circumstantial evidence from which an inference of common design may be drawn.'" *Armstead v. State*, 195 Md. App. 599, 646 (2010) (quoting *McMillian v. State*, 325 Md. 272, 292 (1992)). That is to say, "the State [is] only required to present facts that would allow the jury to infer that the parties entered into an unlawful agreement." *Id.* (quoting *Acquah v. State*, 113 Md. App. 29, 50 (1996)).

The evidence that Jackson aided and abetted McClurkin as well as conspired with him was overwhelming. It showed that Jackson and the victim had a long-standing dispute, emanating from an unpaid debt, which had on at least one occasion resulted in a fistfight between the two men. Moreover, following that fight, Jackson "taunted" the victim, tried to pick fights with him, and "bumped" into him "once or twice a week." Then, at some point, Jackson enlisted McClurkin's help in initiating a fight with the victim in an alleyway. Moreover, on the night of the shooting, the victim was so afraid of Jackson that he asked his mother to watch him as he walked past Jackson's house to return to his friend's house. Thus, Jackson had not just a motive for harming the victim but, an intent to do so, which he

27

displayed on numerous occasions. What is more, Jackson had previously used McClurkin on at least one occasion to achieve that end.

Furthermore, while walking up the street where Jackson and he lived, the victim saw Jackson standing outside, near a maroon SUV in which McClurkin was sitting. When McClurkin got out of the SUV, Jackson said something to him, which led McClurkin to reach into the SUV, for what the jury could have reasonably believed was a gun. Jackson then began to walk behind the victim at a "slow pace," while, at the same time, McClurkin attempted to get ahead of him by walking "very fast" in the street. When the victim turned around to see what Jackson was doing, McClurkin approached him, called out his name, and then shot him. Seconds later, the victim's mother ran up to McClurkin, yelling, whereupon McClurkin pointed the gun at her. Jackson instantly commanded McClurkin not to shoot, saying, "No, Man, no," a command with which McClurkin complied. The evidence was thus compelling that, at the time McClurkin shot Maynard, he was acting in concert with Jackson, who was both figuratively and literally "calling the shots."

Indeed, when we view that evidence in the light most favorable to the prosecution, we conclude that a rational jury could have found, beyond a reasonable doubt, that Jackson aided and abetted McClurkin in the shooting by instigating the shooting; choosing its location; instructing McClurkin how he wanted to proceed; helping McClurkin by walking behind the victim, either to distract him or to block his escape, or both; and finally, dictating the scope of the crime by instructing McClurkin not to shoot the victim's mother. Thus, Jackson

28

"participated by 'knowingly associating with the criminal venture with the intent to help commit the crime, being present when the crime is committed, and seeking, by some act, to make the crime succeed.'" *Davis*, *supra*, 207 Md. App. at 319 (quoting MPJI-Cr 6:01). Moreover, a jury could have found, from that same evidence, that Jackson and McClurkin combined "to accomplish some unlawful purpose," *Armstead*, *supra*, 195 Md. App. at 646 (quoting *Mitchell v. State*, 363 Md. 130, 145 (2001)), with the intent to do so, MPJI-Cr 4:08, that is, they entered into a criminal conspiracy.

Jackson further claims that there were discrepancies and lapses in the evidence offered at trial, namely, that the only evidence of what Jackson said to McClurkin, the night of the shooting, was Jackson's instruction to him not to shoot the victim's mother; that the victim testified that he did not hear anything said between Jackson and McClurkin; that there were no hand motions or gestures exchanged between the two; and that Jackson, unlike McClurkin, denied his involvement in the shooting during his jailhouse phone call. None of this, however, leads us to conclude that the evidence did not support Jackson's convictions, as it was the jury's role to resolve the conflicts in the testimony, to determine the inferences to be drawn from the evidence, and to decide what relative weight to be attributed to the evidence presented, which they did.

**IV.**

Jackson claims that the circuit court erred in failing to merge his conviction and sentence for reckless endangerment into the conviction and sentence for attempted first-degree murder. The State agrees and so do we.

The jury found Jackson guilty of both attempted murder in the first degree and reckless endangerment of the same victim. Thereafter, Jackson was sentenced to life imprisonment, with all but seventy years suspended, for the attempted murder charge and to a concurrent term of five years' imprisonment for reckless endangerment.

In *Williams v. State*, 100 Md. App. 468, 490 (1994), we discussed the relationship between reckless endangerment and attempted murder, observing that "[t]o move from reckless endangerment, where one is simply indifferent to the threat to the victim, to one of the more malicious crimes where death or serious bodily harm is affirmatively desired or specifically intended—such as attempted murder . . .—primarily involves racheting the *mens rea* up to the next level of blameworthiness." *Williams v. State*, 100 Md. App. 468, 490 (1994). At that point, the lesser included offense of reckless endangerment merges into the greater inclusive offense, *id.* at 510, which in the instant case was attempted first-degree murder. Thus, the circuit court should have merged Jackson's conviction for reckless endangerment into his conviction for attempted first-degree murder.[8] We shall therefore

---

[8]Though, like Jackson, McClurkin also received separate convictions and sentences for both attempted first-degree murder as well as reckless endangerment, McClurkin does not raise that issue in this appeal. We note that Maryland Rule 4-345 permits a trial court to
(continued...)

vacate his sentence for reckless endangerment. *Carroll v. State*, 202 Md. App. 487, 518 (2011), *aff'd*, 428 Md. 678 (2012) ("Typically. . . where merger is deemed to be appropriate, this Court . . . vacates the sentence that should be merged . . . .").

## V.

Finally, Jackson contends that the circuit court erred in sentencing him on each of three counts of conspiracy because the evidence presented at trial supported only a single conspiracy. The State agrees, as do we.

Jackson was convicted of three counts of conspiracy: conspiring to commit murder in the first degree, for which he was sentenced to ten years' imprisonment; conspiracy to use a handgun in the commission of a crime of violence, for which he was sentenced to five years' imprisonment; and conspiracy to wear, carry, or transport a handgun upon his person, for which he was again sentenced to five years' imprisonment.

"It is well settled in Maryland that only one sentence can be imposed for a single common law conspiracy no matter how many criminal acts the conspirators have agreed to commit." *Jordan v. State*, 323 Md. 151, 161 (1991) (quoting *Tracy v. State*, 319 Md. 452, 459 (1990)). "The unit of prosecution," the Court of Appeals has said, "is the agreement or combination rather than each of its criminal objectives." *Id.*

---

(...continued)
"correct an illegal sentence at any time" and that the "failure to merge a sentence is considered to be an 'illegal sentence' within the contemplation of the rule." *Pair v. State*, 202 Md. App. 617, 624 (2011), *cert. denied*, 425 Md. 397 (2012). Thus, McClurkin may still challenge the court's failure to merge those convictions, as well as his conspiracy convictions (as discussed below in section V of this opinion) in a motion to correct an illegal sentence.

In *Jordan*, the defendant was convicted of both conspiracy to murder and conspiracy to commit robbery and given a separate sentence for each of the two offenses. Because the facts in that case did "not support the determination that two conspiracies existed," the Court concluded that the imposition of separate sentences for both conspiracy convictions was "plain error." *Id.* Then, invoking what is now Maryland Code, Criminal Law Article, § 1-202,[9] which provides that the "punishment of a person who is convicted of conspiracy may not exceed the maximum punishment for the crime that the person conspired to commit," the *Jordan* Court left standing the conviction for conspiracy to commit the crime with the greater maximum penalty, that is, conspiracy to murder, and vacated both the conviction and the sentence for conspiracy to commit the crime with a lesser maximum penalty, conspiracy to commit robbery. *Id.* at 162.

In the instant case, there was only one conspiratorial agreement between Jackson and McClurkin—that was, to kill the victim—from which flowed each of the criminal acts committed. Therefore, in accordance with *Jordan*, we shall leave standing the conviction and sentence for conspiracy to commit the crime with the greatest maximum penalty, that is, conspiracy to murder, and shall vacate Jackson's convictions and sentences for conspiracy

---

[9]At the time *Jordan v. State*, 323 Md. 151 (1991), was decided, the substantively identical statute was codified at Article 27, § 38.

32

to use a handgun in the commission of a crime of violence and for conspiracy to wear, carry, or transport a handgun upon his person.

**IN APPEAL 2746 OF THE SEPTEMBER 2011 TERM, JUDGMENTS OF THE CIRCUIT COURT FOR BALTIMORE CITY AFFIRMED. COSTS TO BE PAID BY MCCLURKIN.**

**IN APPEAL 2749 OF THE SEPTEMBER 2011 TERM, JACKSON'S SENTENCE FOR RECKLESS ENDANGERMENT IS HEREBY VACATED; JACKSON'S CONVICTIONS AND SENTENCES FOR CONSPIRACY TO USE A HANDGUN IN THE COMMISSION OF A CRIME OF VIOLENCE AND CONSPIRACY TO WEAR, CARRY, OR TRANSPORT A HANDGUN UPON HIS PERSON ARE HEREBY VACATED; ALL OTHER JUDGMENTS OF THE CIRCUIT COURT FOR BALTIMORE CITY OTHERWISE AFFIRMED. COSTS TO BE PAID 75% BY JACKSON AND 25% BY MAYOR AND CITY COUNCIL OF BALTIMORE.**